PEOPLE v DINSMORE

Docket No. 78-4574. Submitted June 12, 1980, at Detroit.—Decided
    February 17, 1981. Leave to appeal applied for.

    Donald S. Dinsmore was convicted of two counts of first-degree
    murder and was sentenced to prison, Tuscola Circuit Court,
    Martin E. Clements, J. He appeals, alleging that the trial court
    erred in allowing the introduction of certain evidence improp-
    erly seized and in allowing the prosecution to make statements
    of fact not supported by the evidence presented, that the
    evidence adduced by the prosecution was insufficient to support
    his conviction, that he was denied effective assistance of coun-
    sel, and that the trial court improperly instructed the jury and
    erred in allowing the prosecutor to engage in improper argu-
    ment before the jury. *Held:*

    1. A shotgun, spent and live shotgun shells, and reloading
    equipment and supplies were properly admitted into evidence.
    Defendant did not have a reasonable expectation of privacy in
    the area in which some of the items were found, and thus no
    "search" as proscribed by the Fourth Amendment occurred.
    The police officers had probable cause to seize certain items,
    and defendant consented to their seizure. The items seized,
    along with other evidence found at the murder scene, provided

REFERENCES FOR POINTS IN HEADNOTES
[1] 68 Am Jur 2d, Searches and Seizures § 60.
[2, 3] 68 Am Jur 2d, Searches and Seizures §§ 2, 4, 8, 23.
[4] 68 Am Jur 2d, Searches and Seizures § 2.
[5] 68 Am Jur 2d, Searches and Seizures §§ 2, 4.
[6] 5 Am Jur 2d, Appeal and Error §§ 880-887.
[7] 29 Am Jur 2d, Evidence §§ 523, 582, 590, 596.
    Constitutional aspects of procedure for determining voluntariness of
        pretrial confession. 1 ALR3d 1251.
[8] 68 Am Jur 2d, Searches and Seizures § 46 *et seq.*
[9] 5 Am Jur 2d, Appeal and Error § 574.
    29 Am Jur 2d, Evidence § 411 *et seq.*
[10, 11] 68 Am Jur 2d, Searches and Seizures §§ 67-70.
[12] 75 Am Jur 2d, Trial § 251 *et seq.*
[13] 29 Am Jur 2d, Evidence § 125.
    30 Am Jur 2d, Evidence § 1170.

the probable cause necessary to subsequently issue a search warrant for defendant's residence where further evidence was discovered.

2. The trial court's allowance of the prosecutor's statement of fact not supported by the evidence constituted error, but this error did not amount to a miscarriage of justice requiring reversal of the jury's verdict.

3. The evidence presented by the prosecution was sufficient to allow the jury to find defendant guilty beyond a reasonable doubt of the essential elements of the crime.

4. Defendant's claims that he was denied effective assistance of counsel and that the trial court erred in instructing the jury and in permitting improper argument by the prosecutor before the jury are without merit.

Affirmed.

1. SEARCHES AND SEIZURES — SEARCHES WITHOUT WARRANTS — BURDEN OF PROOF — PROSECUTING ATTORNEYS.

The burden of sustaining the validity of a search without a warrant is on the prosecution.

2. SEARCHES AND SEIZURES — WORDS AND PHRASES — REASONABLE EXPECTATION OF PRIVACY — CONSTITUTIONAL LAW.

. A search, as contemplated by the Fourth Amendment protection against unreasonable searches and seizures, has taken place where it is in an area where an individual has a reasonable expectation of privacy in the area searched or the materials seized, but what a person knowingly exposes to the public, even in his own home or office, is not subject to Fourth Amendment protection.

3. SEARCHES AND SEIZURES — REASONABLE EXPECTATION OF PRIVACY — TRESPASS.

There is no single factor which is determinative of an individual's reasonable expectation of privacy in determining whether an unreasonable search as prohibited by the Fourth Amendment has occurred, but among the factors to be considered are: whether the area searched was within the curtilage of a residence or was open to view from a public area, whether the property searched was owned by the defendant or was in some way controlled by him, whether the defendant had a subjective expectation of privacy in the area searched, whether the area searched was enclosed, posted against trespass, or frequented by neighbors or strangers, and whether there were obstructions to viewing into the area.

4. SEARCHES AND SEIZURES — REASONABLE EXPECTATION OF PRIVACY — PERMISSIVE INTRUSION INTO PRIVATE AREAS.

A person may permit or invite intrusion by friends or neighbors into areas in which he has a reasonable expectation of privacy and which are constitutionally protected against unreasonable searches and seizures by state authorities.

5. TRESPASS — RIGHT TO PRIVACY — PERMISSIBLE INTRUSION INTO PRIVATE AREAS.

A person's right to privacy is not invaded nor is it illegal per se for an individual, during daylight hours, to approach property in which the occupant has a reasonable expectation of privacy with the honest intention of questioning the occupant, absent express orders from the person in possession against any possible trespass.

6. APPEAL — TRIAL COURT RULINGS — SUPPRESSION HEARINGS — STANDARD OF REVIEW — CRIMINAL LAW.

The Court of Appeals, in reviewing a trial court's order following a suppression hearing, applies a "clearly erroneous" standard, and the order, although there is evidence to support it, will be found to be clearly erroneous where the court on the entire evidence. is left with the firm conviction that a mistake has been made.

7. APPEAL — CRIMINAL LAW — VOLUNTARINESS OF CONFESSIONS — TRIAL COURT RULINGS — STANDARD OF REVIEW.

The Court of Appeals, in reviewing the voluntariness of a confession, is required to examine the whole record and make an independent determination of the ultimate issue of voluntariness, and where, following such review, the court does not possess a definite and firm conviction that a mistake was committed by the trial court in its ruling, the ruling will be affirmed.

8. SEARCHES AND SEIZURES — SEARCHES WITHOUT WARRANTS — CONSENT TO SEARCH — VOLUNTARINESS OF CONSENT — PROSECUTING ATTORNEYS — BURDEN OF PROOF.

The voluntariness of a consent to a search without a warrant depends upon the totality of the circumstances surrounding the giving of the consent, and where a justification of a search on the basis of the consent of the subject of the search is offered, a demonstration by the prosecution by direct and positive evidence is required to show that the consent was voluntary and not the result of an exploitation of an illegal act.

9. APPEAL — CRIMINAL LAW — EVIDENCE — CONSTITUTIONAL LAW — ADMISSIBILITY OF EVIDENCE.

The Court of Appeals must determine whether evidence which a defendant alleges was erroneously admitted was decisive to the outcome of a case where the defendant raises, for the first time on appeal, a constitutional question regarding the propriety of the search by which the evidence was obtained.

10. SEARCHES AND SEIZURES — SEARCH WARRANTS — MAGISTRATES — PROBABLE CAUSE — STATUTES.

A magistrate, where presented with an affidavit for a search warrant, shall issue the warrant where he finds that there is reasonable or probable cause therefor, and a finding of probable cause should be made where the facts and circumstances presented would cause a man of reasonable caution to believe that the items sought to be seized were in the place stated in the warrant (MCL 780.651; MSA 28.1259[1]).

11. SEARCHES AND SEIZURES — SEARCH WARRANTS — MAGISTRATES — PROBABLE CAUSE — APPEAL.

An affidavit for a search warrant is not to be read technically by a magistrate but must be viewed in a common-sense manner in determining probable cause to issue the warrant, and a magistrate's determination of the existence of probable cause will not be set aside on appeal absent a clear abuse of discretion.

12. PROSECUTING ATTORNEYS — UNSUBSTANTIATED STATEMENTS OF FACT — ERROR — APPEAL — STATUTES.

A prosecutor may not make a statement of fact to a jury which is unsupported by the evidence in a case, but a verdict in the case will not be set aside because such a statement was made unless it affirmatively appears that such a statement resulted in a miscarriage of justice (MCL 769.26; MSA 28.1096).

13. CRIMINAL LAW — DUE PROCESS — SUFFICIENCY OF EVIDENCE — REASONABLE DOUBT — CONSTITUTIONAL LAW.

Due process as guaranteed by the Fourteenth Amendment requires that before a defendant can be convicted of a criminal offense the prosecutor must introduce sufficient evidence which would justify a rational trier of fact in concluding that the defendant is guilty beyond a reasonable doubt of each of the essential elements of the crime.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Artis M. Noel,* Prosecuting Attorney (by *Thomas C. Nelson,* Assis-

tant Attorney General, Prosecuting Attorneys Appellate Service), for the people.

*Carl Ziemba,* for defendant on appeal.

Before: BASHARA, P.J., and D. C. RILEY and E. A. QUINNELL,* JJ.

E. A. QUINNELL, J. Defendant was charged with two counts of open murder. Following his first trial, the court declared a mistrial after the jury was unable to agree on a verdict. A second trial was conducted at which defendant was found guilty by a jury of two counts of first-degree murder. MCL 750.316; MSA 28.548. He was sentenced to two concurrent mandatory life terms of imprisonment and now appeals of right. We affirm.

On Saturday, September 24, 1977, the bodies of Francis and Henry Beamish were found inside their residence on Waterman Road in Tuscola County. The Tuscola County Sheriff's Department was notified, and officers of that department went to the scene. The officers observed three spent, red, low-brass, skeet shot #8, 12-gauge, Winchester AA trap shotgun shells lying on the ground outside a broken bedroom window. The body of Mrs. Beamish was lying on a bed in that bedroom. Inside the home the officers found seven shotgun wads. The body of Mr. Beamish was found in the living room.

Defendant is the former son-in-law of Mr. and Mrs. Beamish. According to the officers, they wanted to talk with defendant, not out of any particular suspicion but as part of their general investigation into the deaths. To that end, on Sunday, September 25, 1977, Detective Ronald Phillips and Deputy Larry W. Walker, both with the Tuscola County Sheriff's Department, together

---

* Circuit judge, sitting on the Court of Appeals by assignment.

with the Tuscola County Prosecuting Attorney,[1] went to the home of Annabell Dinsmore, defendant's mother. The Annabell Dinsmore home is in Bay County. Under circumstances set forth in greater detail later in this opinion, the officers came into possession of a 12-gauge shotgun belonging to the defendant, several spent shotgun shells, and a bag of more than 50 live shotgun shells. After a shell had been test fired in the shotgun, it was compared with one of the spent shells found at the Beamish residence. A state police crime laboratory scientist concluded that two of the spent shells at the Beamish residence had been fired from the defendant's shotgun. Based upon that information, Deputy Walker executed an affidavit for a warrant to search the defendant's mobile home and adjoining premises. The warrant was executed later that same day, and several items were seized, including a reloader and supplies.

Prior to trial, defendant moved to suppress the items taken from his mother's home. Had the motion been granted, the items taken from his own home would also have been suppressed. The motion was denied by the trial court, and the evidence was used at the trial at which he was convicted. Following his conviction, the defendant moved for a new trial. The motion was denied by the trial court.

On appeal to this Court, defendant alleges some eight bases of error requiring reversal.

[1] The prosecutor took part in the interrogation of defendant. He also represented the People at the subsequent suppression hearing as well as at both trials of the defendant. We suggest that the prosecutor either refrain from personal participation in investigations, or, if his investigatory efforts are of sufficient value, that he not participate as an attorney in subsequent proceedings in order that he be available to testify as to matters of which he has personal knowledge. Code of Professional Responsibility and Canons, DR 5-102(A).

I. The defendant claims that the shotgun and spent and live shells seized at the Annabell Dinsmore residence were improperly taken by the authorities, that these items therefore should not have been admitted in evidence at trial, and that, since these same items formed the basis for the search warrant for defendant's residence, any items seized at the defendant's residence should also have been suppressed.

The circumstances involved in the acquisition of these items at the Annabell Dinsmore residence were described at the suppression hearing as follows.

The Dinsmore residence is located at the end of Reese Road. The Dinsmore driveway continues in a northerly direction from the end of Reese Road. The residence itself is located somewhat west and north of the driveway. West of the driveway and south of the residence is a yard area, described as being like a lawn but not mowed, with some weeds growing in it. The lawn is not fenced. A rabbit cage is located some 30 to 40 feet south of the house and perhaps 75 feet west of the driveway.

As the law-enforcement officers entered the driveway, they observed defendant and his brother Daniel Dinsmore standing near the cage. Defendant was laying a shotgun down, and Daniel Dinsmore had a shotgun in his possession. They appeared to have been shooting skeet. As the officers were leaving their car, defendant walked over toward the car, meeting the officers at some point near the automobile. The officers were in plain clothes in an unmarked car. The officers identified themselves as such, and defendant identified himself. Walker asked the defendant to have a seat in the patrol car and engaged him in conversation after informing him of his *Miranda* rights.

Meanwhile, Officer Phillips and the Prosecuting

Attorney continued over to the vicinity of the cage where Daniel Dinsmore was standing. Once there, Phillips was able to observe several spent shotgun shells on the ground, some of which appeared identical to the spent shells found at the Beamish residence. He also observed a 12-gauge shotgun. He asked Daniel Dinsmore who owned the shotgun and was told that it belonged to the defendant. He then asked Daniel Dinsmore to unload the shotgun, which Daniel did.

At this point, the testimony is in sharp conflict. The main thrust of the testimony of both Phillips and Walker is that Phillips then returned to the patrol car without the shotgun or shells. After some further discussion, the defendant obligingly retrieved a bag of some 54 live shells from his automobile and also consented to the officers' taking the shotgun and spent shells from the vicinity of the rabbit cage. The testimony of defendant and his brother was to the effect that Phillips retrieved the shotgun and shells before he returned to the automobile, that defendant did not consent to their seizure by the police, but that the police said, "We're going to keep them anyway".[2]

---

[2] The version of the defendant and his brother finds some support in the testimony of the officers both at the suppression hearing and at the trial. At the suppression hearing, Walker testified in part as follows:

"Q And then what occurred?

"A That's when Mr. Dinsmore took the shells out of the car.

"Q Were those shells loaded or unloaded?

"A Loaded.

"Q Did you see a weapon at that time, or prior to that time in the possession of Mr. Phillips?

"A Mr. Phillips had brought a shotgun to the patrol car."

Walker's trial testimony also suggests that Phillips had taken possession of the shotgun before the defendant handed over the bag of shells from his car:

"Q Is this the shotgun that Mr. Phillips had in his possession at that time?

"A Yes, it is.

At the conclusion of the testimony at the suppression hearing, the trial court correctly addressed the search issue and the seizure issue separately.

A. *The "search".*

The prosecution has the burden of sustaining the validity of a warrantless search. *People v White,* 392 Mich 404; 221 NW2d 357 (1974).

Our first inquiry is to determine whether there was a "search" in a constitutional sense.

"From *Katz v United States,* 389 US 347; 88 S Ct 507; 19 L Ed 2d 576 (1967) there has evolved a test, applied by the courts, to determine whether or not a search, by Fourth Amendment standards, has indeed taken place. Simply put, if an individual has a reasonable expectation of privacy in the area searched, or the materials seized, a search has been conducted. 'What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protec-

"Q Did you subsequently come into possession of that?

"A Yes.

"Q And how did that occur?

"A I was seated in the patrol car and he handed it to me. I placed it on the left side of myself.

"Q And what happened next, if anything?

"A Okay. A short time later Detective Phillips also gave me a box of shells, or rather a bag of shells, shotgun shells.

"Q Did you observe where that bag of shells came from, Sir?

"A Yes, I did.

"Q And where had you seen the bag of shells come from?

"A The rear interior of Mr. Dinsmore's car."

At trial, Phillips also was less certain of the sequence than he had been at the suppression hearing:

"Q Now when you returned to the car, isn't it true that you had the .12 gauge *[sic]* with you?

"A That could have been possible.

"Q In other words you didn't make two trips over to get it, I mean, you didn't go to the area twice to get it, but you brought it back the first time?

"A I don't recall bringing it back the first time, no.

"Q You just said it was possible?

"A It's possible, yes."

tion.' *Katz, supra,* 351." *People v Whalen,* 390 Mich 672, 677; 213 NW2d 116 (1973).

The trial court found that the defendant did not have a reasonable expectation of privacy as to the vicinity in which he and his brother were shooting skeet and that, therefore, the observations of officer Phillips did not constitute a "search" in a constitutional sense. We agree.

There is no single factor which is determinative of an individual's reasonable expectation of privacy. Among the factors mentioned by various courts are: whether the area is within the curtilage of a residence, whether it is open to view from a public area, whether the property was owned by the defendant or in some way controlled by him, whether the defendant had a subjective expectation of privacy, whether the area was enclosed, whether the area was posted against trespass, whether there were obstructions to vision, or whether the area was in fact frequented by neighbors or strangers. We also recognize that a person may permit or even invite intrusion by friends or neighbors into areas as to which he has a reasonable expectation of privacy regarding intrusion by authorities. *People v Hopko,* 79 Mich App 611; 262 NW2d 877 (1977). In *White, supra,* the focus of the appellate inquiry was on the reasonableness of the police conduct rather than on a reasonable expectation of privacy by the defendant.

In considering all of these factors, we conclude that the defendant did not enjoy a reasonable expectation of privacy in the area in which officer Phillips made his observations of the shotgun and the spent shotgun shells. The area was not fenced or enclosed, and there was no obstruction to vision between it and the public street. Neither defendant nor his brother Daniel Dinsmore objected in

the slightest manner to the presence of the officers according to the testimony of the officers. The officers were present during daylight hours and identified themselves as police officers. There was nothing surreptitious or deceptive about their conduct.

Defendant argues that, since the officers were from the Tuscola County Sheriff's Office and the activities in question occurred about 100 feet or so over the county line in Bay County, the officers were mere trespassers and therefore were not rightfully in the place at which they observed the shotgun and the shells. We do not agree that their presence on the property was illegal even though they were outside of their jurisdiction.

"Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant thereof—whether the questioner be a pollster, a salesman, or an officer of the law." *Davis v United States,* 327 F2d 301, 303 (CA 9, 1964).

B. *The seizure.*

The trial court concluded at the end of the suppression hearing that the seizure of the items at the Annabell Dinsmore residence by the police was proper based upon consent having been given by the defendant and also based upon the officers' having had probable cause to seize the items following their initial observation of them.

In reviewing a trial court's order following a suppression hearing, this Court applies a "clearly erroneous" standard. *People v Goss,* 89 Mich App

598, 601; 280 NW2d 608 (1979), and cases cited. A finding is "clearly erroneous" where, although there is evidence to support it, the reviewing court on the entire evidence is left with a firm conviction that a mistake has been made. *People v Hummel,* 19 Mich App 266, 270; 172 NW2d 550 (1969). Our role as a reviewing court was also described in *People v McGillen #1,* 392 Mich 251; 220 NW2d 677 (1974), in which the Supreme Court noted that in reviewing the voluntariness of a confession the appellate court is required to examine the whole record and make an independent determination of the ultimate issue of voluntariness. If after such a review the appellate court does not possess a definite and firm conviction that a mistake was committed by the trial judge in his ruling, that ruling is to be affirmed. *People v White,* 401 Mich 482, 494; 257 NW2d 912 (1977).

As previously noted, the testimony as to consent was in sharp conflict. While we regret the absence of testimony from the prosecuting attorney, we are unpersuaded that the trial court made a mistake. The determination of consent did not involve the drawing of inferences from established facts (see *White, supra)* but rather involved a determination as to who was telling the truth and who was being the most accurate. The trial judge chose to believe the two police witnesses, and we are not willing to say that he was mistaken.

Defendant argues that, even if consent to the seizure of the items was obtained, it was obtained as the result of an exploitation of an illegal act in that the officers had already seized the weapon and shells at the time that they asked for and obtained the consent. As previously noted, the testimony in that regard is disputed. Whether a consent is truly voluntary depends on the totality

of the circumstances. *Schneckloth v Bustamonte,* 412 US 218; 93 S Ct 2041; 36 L Ed 2d 854 (1973), *People v Reed,* 393 Mich 342; 224 NW2d 867 (1975). In addition to the factors described in *Bustamonte* and *Reed,* there should be added consideration of whether the consent was a result of an exploitation of an illegal act. *Brown v Illinois,* 422 US 590; 95 S Ct 2254; 45 L Ed 2d 416 (1975). The prosecution has the burden of establishing the voluntariness of the consent by direct and positive evidence. *People v Chism,* 390 Mich 104; 211 NW2d 193 (1973). Viewing the totality of the circumstances, we conclude that the consent was not tainted. The defendant gave his consent at a time when he was on property owned by his mother, albeit while seated in a patrol car. There is nothing to indicate he was suffering from hunger, thirst, or a lack of sleep. The officers testified that they advised him of his right to refuse to consent to the seizure of the items. The defendant is an adult, although of limited education. The interview was not prolonged, consuming only about one-half hour.

Nor was the consent obtained as the result of an exploitation of an illegal act. Even accepting the defendant's version as to the officers' having taken possession of the shotgun and shells before the consent was given, we agree with the trial court that the officers did have probable cause to seize the shotgun and shells after their observations near the rabbit cage where they were entitled to be. They knew the homicides had been committed with a 12-gauge shotgun and knew the specific characteristics of the shells found outside the window. When they happened upon a shotgun of appropriate gauge and spent shells identical to those found at the scene of the homicides, it would

seem only prudent police conduct to seize the items for comparison purposes and to exclude the defendant as a suspect and thereby narrow the investigation as well as to inculpate him if such should be the result,[3] with or without consent.

Since the officers had probable cause to seize the items, a consent given even afterward would not fall within the proscription of *Brown, supra.*

C. *The sufficiency of the search warrant affidavit.*

This issue was not raised before trial or during trial. Nevertheless, where a constitutional question is raised for the first time on appeal, this Court must determine if the allegedly erroneously-admitted evidence was decisive to the outcome of the case. *People v Merchant,* 86 Mich App 355, 358; 272 NW2d 656 (1978). The evidence seized at defendant's home, specifically the reloader, was obviously decisive, such that appellate review is appropriate.

Where presented with an affidavit for a search warrant, MCL 780.651; MSA 28.1259(1) provides that a magistrate shall issue a search warrant where he finds that there is reasonable or probable cause therefor. A finding of probable cause sufficient to justify issuance of a search warrant should be made where the facts and circumstances presented would warrant a man of reasonable caution to believe that the items sought to be seized were in the stated place. *United States v Lucarz,* 430 F2d 1051 (CA 9, 1970).

The requirement of probable cause does not require that it should appear more likely than not that the evidence sought will be found in the place

---

[3] It should be noted that at trial a forensics firearm expert, testifying on behalf of the defendant, stated that he could not connect the spent shells found outside the Beamish residence with the defendant's shotgun or reloader.

described; it is only necessary that the affidavit enable the magistrate to conclude that it would be reasonable to seek the evidence in the place indicated by the affidavit. *United States v Hendershot,* 614 F2d 648 (CA 9, 1980). Further, the affidavit is not to be read technically but must be viewed in a common-sense manner by the magistrate. The magistrate's determination of probable cause will not be set aside absent a clear abuse of discretion on his part. *People v Thomas,* 86 Mich App 752; 273 NW2d 548 (1978).

Tested by these standards, the affidavit is clearly sufficient and justifies the magistrate's determination of probable cause. Among other items, the affidavit signed by Deputy Walker recites the recovery of the spent shells from the Beamish residence, the recovery of the shotgun and spent shells from the Annabell Dinsmore residence, the fact that the spent shells at the Dinsmore residence were reloads, and the ballistics testing indicating that a spent shell found at the Beamish residence had been fired from defendant's shotgun. Given those facts, it is at least reasonable if not probable that reloading equipment and supplies would be found at the defendant's residence.

II. Defendant claims that he is entitled to a new trial because the prosecutor seriously misstated the testimony to the jury during closing arguments and prejudicially ascribed a motive to defendant in questions posed to defense witnesses.

The prosecution introduced no evidence whatsoever as to motive during its case in chief. During cross-examination of defense witnesses, the prosecuting attorney unsuccessfully attempted to establish a motive, as follows:

Testimony of Daniel Dinsmore.

"Q When did your brother [defendant] get his divorce from your sister-in-law Lois Dinsmore?

"A I don't know.

"Q Could it have been in July of 1977?

"A I don't know sir.

"Q Never discussed divorce problems with him at all?

"A No sir.

"Q Never discussed the problems with visitation?

"MR. GORTE [defendant's counsel]: That's assuming a fact not in evidence.

"THE COURT: Yes, I'll sustain the objection.

"MR. GORTE: Thank you Your Honor.

"BY MR. JOSLYN [prosecutor]:

"Q Did you have any conversations with him at all concerning this divorce or visitation?

"A. Not that I can recall sir.

\* \* \*

"Q And I believe you testified earlier sir that you never had any conversation with your brother Donald concerning the divorce and problems in the divorce, or any problems in the divorce?

"A Well, I brought it up, I brought it up, but he wouldn't talk about it, that's about it.

"Q And was that concerning problems with the Beamishes, and visitation that you brought up?

"A No sir.

"Q When did you bring this up sir?

"A I can't recall. It was somewhere along the line.

"Q Who was present during this conversation?

"A Just me and Don.

"Q And what did you say to him if anything?

"A I just brought it up, 'I heard you're getting a divorce'. He said, 'I don't want to talk about it.'

"THE COURT: I'm sorry, I didn't hear you.

"Q I brought it up to him, 'I heard you're getting a divorce,' and he didn't want to talk about it, so that was the end of it right there.

"BY MR. JOSELYN:

"Q And you never discussed that again with your brother?

"A No sir."

Testimony of Raymond Halozinski.

"Q Did you ever see him [defendant] mad about his divorce?

"A No sir.

"Q Did he ever converse with you about his divorce?

"A No sir.

"Q He kept it to himself?

"A I guess so. He never said nothing to me, so I wouldn't know.

"Q Did you know that he was divorced?

"A No sir.

"Q Did you know anything about his separation from his wife?

"A Only thing I knew is that his wife had left him, and that's all I know. And it was none of my business. I didn't interfere.

"Q He never discussed that at all?

"A No sir.

"Q Wasn't upset as far as you know?

"A As far as I know, no."

Testimony of Al Roth.

"Q Probably. The question is, sir, have you ever seen him (defendant) upset?

[Objection: relevancy; overruled.]

"A Yes, I seen him upset.

"BY MR. JOSELYN:

"Q Violent?

"A Pardon?

"Q Violently upset?

"A Not violently, no.

"Q Can you recall on how many times sir?

"A Oh, I wouldn't have no idea sir.

"Q Generally though he never gets upset?

"A Not any more than usual, that anybody would get upset.

"Q Was he upset sir when his wife divorced him if you know?

"A I wouldn't know sir."

## Testimony of Ned Bedford:

"Q Did you know that at some point in time during the course of your employment with your co-worker Donald Dinsmore that he was divorced?

"A Yes. Right, you know, towards the end of his, and know, employment there.

"Q And did he at any time seem upset about that?

"A No, not to me.

"Q Did he at any time in the numerous conversations that you had with him at work discuss any of the problems he had concerning that divorce?

"MR. GORTE [defendant's counsel]: Objection Your Honor, that's assuming there were problems in the divorce.

"THE COURT: Exactly, I'll sustain the objection.

"MR. GORTE: Thank you Your Honor.

"THE COURT: The Jury should disregard that portion of the question that there were any problems whatever.

"BY MR. JOSELYN:

"Q Did he have any discussions with you at all concerning the divorce, or visitation with his children?

"A No, none at all."

## Testimony of Vaughn Monroe.

"Q Had you on any occasions, Sir, had any conversations with Mr. Dinsmore concerning any visitational rights he may have had with his children after he was separated from his wife?

"MR. GORTE: Objection, Your Honor, that's assuming a fact not in evidence.

"THE COURT: Yes, I'll sustain the objection.

"MR. GORTE: Thank you, Your Honor.

"BY MR. JOSELYN:

"Q Did you have any conversations with your uncle about the divorce?

"A No Sir.

"Q Did you have any conversations with him about visiting with his children?

"A No Sir, just that he said that like he missed them.

"Q He indicated to you, did he not, that he was unable to visit with his children?

"A Not exactly, but I know, I could see between the lines that he couldn't see his kids if they was some place else."

Testimony of William Neering.

"Q Sir, are you aware of when Donald Dinsmore obtained his divorce from Lois Dinsmore?

"A No, I'm not.

"Q He never discussed that with you at all?

"A No, he didn't.

"Q Never discussed his visitational privileges with his minor children?

"MR. GORTE: I'm going to object, Your Honor, I'm going to ask that the Prosecutor be instructed to stay away from visitational privileges, that has not been established on the case in chief.

"THE COURT: I agree. There have been a number of questions having to do with visitation privileges with the children. *But there's no evidence whatever in this case that there was any problem with respect to that, except one witness who may have alluded to it in a collateral manner.* I think you ought to stay away from that area. *The Jury is instructed not to assume anything by the nature of the question. You may continue.*" (Emphasis supplied.)

During final argument, the following occurred:

"BY MR. JOSELYN:

"The People do not have to prove a motive in a criminal case. I think there's something that you can conclude here, and that is, based upon the testimony of Daniel Dinsmore, if you recall his testimony, were there any conversations concerning anything about the mar-

riage? Oh, yeah, he said something about—I can't recall exactly what he said, and I'm not quoting, but generally something, words to the effect that there were some problems because he couldn't visit with his children.

"MR. GORTE [defendant's counsel]: I'm going to object to that Your Honor, that's not in the record at all.

"THE COURT: I'm going to let the Jury decide what the testimony in this case is. I'm not going to comment on whether or not it's in the record. Your objection is noted.

"MR. JOSELYN [prosecutor]: As I indicated to you when I started, Ladies and Gentlemen of the Jury, I'm a frail human being. I cannot recall, this case has been going for quite some time. We're in our third week, I'm not attempting to directly quote any particular witnesses. If I misstate a fact, you are the fact finders, I'm merely an attorney arguing the case to the best of my ability based upon my recollection of that testimony."

The rule regarding disposition of such claims is found in *People v Wheat,* 55 Mich App 559, 565; 223 NW2d 73 (1974):

"It is well settled that a prosecutor may not make a statement of fact to the jury which is unsupported by the evidence in the case. However, it is equally well settled that a verdict in a criminal case cannot be set aside unless it affirmatively appears that the error complained of has resulted in a miscarriage of justice. MCL 769.26; MSA 28.1096; *People v Green,* 7 Mich App 346, 354; 151 NW2d 834, 838 (1967)."

In our view, no miscarriage of justice occurred. The prosecutor made no further mention of motive during the balance of his closing arguments. The court was prompt in its curative admonition to the jury during the examination of the witness Neering. While it might have been preferable for the court to have been equally as vigorous in ruling on the objection made during argument, perfection is

not a prerequisite to a fair trial. In our view, the questioning and the argument were not sufficient to significantly divert the jury's attention from accurate consideration of the actual issues in the case. *People v Knolton,* 86 Mich App 424; 272 NW2d 669 (1978).

III. Defendant claims that the evidence adduced by the prosecution was insufficient to prove that defendant was the perpetrator of the crime.

The standard to be applied is found in *Jackson v Virginia,* 443 US 307; 99 S Ct 2781; 61 L Ed 2d 560 (1979), as adopted in *People v Hampton,* 407 Mich 354; 285 NW2d 284 (1979). The issue is whether the evidence presented by the prosecution, viewed in the light most favorable to it, is sufficient evidence from which a rational trier of fact could find guilt beyond a reasonable doubt of each of the essential elements of the crime.

Viewed most favorably for the prosecution, there was evidence from which the jury could have found the following beyond a reasonable doubt. The victims died as a result of being shot by shells fired from a shotgun. The spent shells found outside the victims' home had been loaded in defendant's reloading equipment and had been fired from his shotgun. The initial shot from outside the bedroom window went through a closed shade. This would tend to show that the perpetrator was familiar with the layout of the Beamish household and was aware of the victims' sleeping habits. The victims customarily left the kitchen door unlocked on warm evenings. The perpetrator apparently entered through that door, which was the only unlocked door. This indicated some knowledge of the victims' customs. Defendant, the former son-in-law of the victims, had been at their home several times and presumably was familiar with their

habits. Seven plastic shot wads were recovered from the crime scene and from the victims' bodies. Three spent shells were recovered at the scene, and four similar spent shells were found in defendant's bathroom. The wads recovered from defendant's home were similar to those found at the crime scene. The shells, both spent and live, recovered from defendant were similar to the three spent shells. Defendant was in possession of his shotgun the day after the bodies of the victims were discovered.

It is certainly conceivable that someone, with or without defendant's knowledge, used his shotgun and shells to commit the crimes. Nevertheless, we conclude that the established facts are sufficient to allow a rational trier of fact to find the defendant guilty beyond a reasonable doubt as to each of the essential elements of the crime.

IV. Defendant's other allegations of error involve claims that he was denied the effective assistance of counsel, that the trial court committed instructional error, and that the prosecuting attorney engaged in other improper jury argument. We have carefully considered each of those claims, and find them to be without merit.

The convictions are affirmed.