PEOPLE v PAULI

Docket No. 70273. Submitted May 15, 1984, at Detroit.—Decided
November 5, 1984. Leave to appeal applied for.

.Frederick Pauli was convicted of first-degree murder, Recorder's
Court of Detroit, Benjamin C. Stanczyk, J. His conviction was
affirmed in an unpublished opinion by the Court of Appeals in
an appeal as of right and his application for leave to appeal to
the Supreme court was denied, 411 Mich 894 (1981). Defendant
thereafter filed a delayed motion for new trial, which was
denied, Edward M. Thomas, J. He applied for leave to file a
delayed appeal, which was granted. *Held:*

1. BRONSON, J., would hold that before the Court of Appeals
grants leave for a second appeal which raises trial and pretrial
related issues the defendant should first establish that he did
not receive effective assistance from his former appellate coun-
sel. Because leave had already been granted herein the Court
proceeded to the merits to determine whether the trial court
abused its discretion in denying the defendant's motion for a
new trial.

2. The prosecutor's cross-examination of defendant regarding
defendant's prior convictions and drug use was not improper
since the matters were first raised by defense counsel during
direct examination.

3. The trial court erred in ruling that, because defense
counsel had impermissibly inquired into a prosecution witness's
prior drug use, the prosecutor could inquire into defendant's
prior drug usage. However, because the prosecutor limited his
questions so as not to take advantage of the erroneous ruling,

REFERENCES FOR POINTS IN HEADNOTES
[1] 21A Am Jur 2d, Criminal Law § 975.
  Adequacy of defense counsel's representation of criminal client
    regarding appellate and post-conviction remedies. 15 ALR4th 582.
[2] 4 Am Jur 2d, Appeal and Error § 124.
  5 Am Jur 2d, Appeal and Error § 851.
  58 Am Jur 2d, New Trial §§ 212, 213.
[3, 4] 81 Am Jur 2d, Witnesses §§ 484, 497, 525.
[5] 5 Am Jur 2d, Appeal and Error § 744.
[6] 75 Am Jur 2d, Trial § 260.

the potential for unfair prejudice created by the ruling was not realized and the error was, therefore, harmless.

4. The issue of the prosecutor's inquiry into defendant's failure to testify at his preliminary examination was decided in the previous appeal and the prior panel's decision is the law of the case.

5. The prosecutor's offer to stipulate to the admission into evidence of the preliminary examination transcript was harmless. Under the circumstances, the jury could not have been left with the impression that the defense was hiding evidence.

6. The prosecutor improperly attempted to ascribe a motive to the defendant based upon innuendo which had no basis in the evidence. The error was harmless, however, in light of the evidence presented at trial.

7. Defendant's allegation that the trial court's criticism of defense counsel prejudiced defendant is without merit.

Affirmed.

1. CRIMINAL LAW — APPEAL — RENEWED APPEAL — ASSISTANCE OF COUNSEL.

A defendant seeking to appeal his conviction a second time, where he has previously exhausted the appeal process and then sought unsuccessfully a new trial, raising trial-related issues should first establish that he did not receive effective assistance from his former appellate counsel.

2. NEW TRIAL — JUDGE'S DISCRETION — APPEAL.

The decision to grant a delayed motion for a new trial rests within the sound discretion of the trial court and will not be disturbed on appeal unless a clear abuse of discretion is shown.

3. CRIMINAL LAW — EVIDENCE — PRIOR CRIMINAL ACTIVITY.

A prosecutor on cross-examination may inquire into a defendant's past convictions where evidence regarding those convictions has already been introduced by defense counsel on direct examination.

4. CRIMINAL LAW — EVIDENCE — PRIOR CRIMINAL ACTIVITY.

A trial court erred in ruling that, because defense counsel had impermissibly inquired into a prosecution witness's prior drug use, the prosecution should be allowed to inquire into the defendant's prior drug use; identical treatment of opposing parties in a criminal prosecution does not necessarily achieve a fair result.

5. APPEAL — LAW OF THE CASE.

A previous disposition by the Court of Appeals, in a prior appeal

of a case, on the merits of an issue is the law of the case and precludes further review of that issue on a subsequent appeal.

6. CRIMINAL LAW — PROSECUTING ATTORNEYS — THEORY OF CASE.

A prosecutor may argue his theory of a case based on logical inferences drawn from the evidence admitted; intimations made must, however, have a factual basis.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, *Edward Reilly Wilson,* Deputy Chief, Civil and Appeals, and *Jeffrey Caminsky,* Assistant Prosecuting Attorney, for the people.

*Arthur J. Tarnow,* for defendant on appeal.

Before: M. J. KELLY, P.J., and BRONSON and C. W. SIMON, JR.,* JJ.

BRONSON, J. In February, 1978, a jury found defendant guilty of first-degree murder, MCL 750.316; MSA 28.548. Defendant was sentenced to life imprisonment. Defendant appealed as of right to this Court and we affirmed defendant's conviction in a memorandum opinion dated July 30, 1979 (Docket No. 78-1439). Defendant's delayed application *in propria persona* for leave to appeal was denied by the Michigan Supreme Court on May 5, 1981. 411 Mich 894 (1981). On December 13, 1982, defendant filed an application for leave to file a delayed motion for new trial. In an order dated March 11, 1983, the trial court denied defendant's motion for new trial. Defendant then applied to this Court for leave to file a delayed appeal. This Court granted leave in an order dated December 8, 1983.

In his application for delayed appeal, defendant sought to appeal from the judgment of conviction and sentence. I have previously expressed my view

* Circuit judge, sitting on the Court of Appeals by assignment.

that the delayed appeal procedure provided in GCR 1963, 803.3 was not intended to provide a second appeal to a litigant who has previously taken advantage of his right to appeal. *People v Tubbs,* 64 Mich App 341, 347-348; 236 NW2d 77 (1975) (BRONSON, J., *concurring).*

"There is good reason for restricting repeated and unlimited availability of appellate review to a criminal defendant. He already has a constitutional right to appeal his conviction to this Court. If unsatisfied with our treatment of that appeal, he may request rehearing. GCR 1963, 819.4. He may also request Supreme Court review. GCR 1963, 853.

\* \* \*

"There should be but one opportunity to raise nonjurisdictional errors on appeal. That is the rule elsewhere. \* \* \* Otherwise, finality is never achieved. The appeal process becomes a battle of attrition, waged by a relentless prisoner with nothing to lose and everything to gain on an adversarial battlefield the conditions of which—through the mere passage of time—necessarily begin to take on a appearance very different from those prevailing at the time of trial. As the *Pickett [People v Pickett,* 391 Mich 305; 215 NW2d 695 (1974)] Court stressed:

" 'Since a period of years may very well be involved, the problems of finding witnesses in our mobile society, the state of their memory, the availability of records and exhibits, etc., are very real and very significant.' *People v Pickett, supra,* p 308." (Footnotes and citations omitted.)

Although in *People v Pickett, supra,* the Supreme Court granted defendants an appeal as of right following determination of probation violation and sentence, the Court limited the appeal to matters relating to the probation violation. The Court stated:

"We have given defendant the opportunity to raise

any questions concerning his trial on his first appeal as of right. To allow him to raise trial related matters on this second appeal would, in effect, be granting two rights of appeal to the same final determination and make the 60-day requirement of GCR 1963, 803.1 in taking an appeal as of right meaningless." *People v Pickett, supra,* pp 316-317.

The state's interest in "finality" does not, however, override a defendant's right to effective assistance of appellate counsel. Certainly, a criminal defendant's appeal as of right and right to appointed appellate counsel encompass the right to effective assistance of appellate counsel. *People v Gorka,* 381 Mich 515, 521-522; 164 NW2d 30 (1969); *People v Militello,* 33 Mich App 93, 94; 189 NW2d 838 (1971). Also see *Anders v California,* 386 US 738, 744; 87 S Ct 1396; 18 L Ed 2d 493 (1967), *reh den* 388 US 924; 87 S Ct 2094; 18 L Ed 2d 1377 (1967).

In my opinion, before this Court entertains a second appeal which raises trial-related issues (and before this Court grants leave to file that appeal), a defendant must first establish that he did not receive effective assistance from his former appellate counsel. Such a prerequisite is especially important where defendant's claim of ineffective assistance of appellate counsel is based on counsel's failure to raise certain issues on appeal; otherwise, a defendant could file appeals *ad infinitum.* I believe that conditioning a defendant's right to raise pretrial and trial issues in a second appeal on a showing of deprivation of effective assistance of appellate counsel serves to protect the people's interest in "finality" as well as the defendant's right to a meaningful appeal.

This Court has already granted defendant leave to file this delayed appeal. It would therefore be inappropriate for this panel to decline to hear the

appeal already granted. We proceed to the merits of the issues raised in this appeal with the understanding that the only order which could be appealed at this time under GCR 1963, 803.3 is the trial court's order denying defendant's motion for new trial. The decision to grant a delayed motion for new trial rests within the sound discretion of the trial court and will not be disturbed unless a clear abuse is shown. *People v Barrows,* 358 Mich 267, 272; 99 NW2d 347 (1959).[1]

Defendant's conviction stems from the brutal murder of Judith Gale Wing on August 27, 1977. The cause of Wing's death was strangulation by ligature. After death occurred, the victim sustained a massive crush injury to her head. A clothes pole, eight-to-ten feet long with a four-to-five-foot crossbar at its top, which was encased in an approximately two-and-one-half-foot length of concrete, was found next to Wing's nude body.

The prosecution's theory was that defendant and Kenneth Copley participated in the murder. Copley pled guilty to second-degree murder in exchange for his testimony against defendant. Apart from some circumstantial evidence which tended to support equally the theories of the prosecution and the defense, the prosecution's case completely rested on Copley's testimony.

Copley testified that he was at the Beginning Lounge on August 26, 1977, with a friend, Frank Rex, and became friendly with Wing. A mutual friend arranged for Copley to give defendant a ride to the halfway house where defendant was residing. Before the night of the crime, defendant and

---

[1] Defendant contemporaneously filed an application for leave to file a delayed motion for new trial and the delayed motion for new trial. As in *People v Barrows, supra,* p 273, the trial court apparently granted the application for leave since the court's order denied the delayed motion for new trial.

Copley were acquainted, but did not know each other well.

Copley, Rex, defendant, and Wing left the lounge in Copley's car and went to a motorcycle clubhouse. The testimony established that Copley and defendant's brother were members of the Iron Coffin Motorcycle Club, but defendant was not a member of any motorcycle club. After consuming more alcohol at the clubhouse, the four left and dropped off Rex. Copley stopped at his house so defendant could telephone the halfway house to say that he was coming home. The three then went in Copley's car to Rouge Park where the police told them to leave because the park was closed. Defendant testified that he was sleeping on and off as they drove around in Copley's car.

Copley then drove to a park on Wadsworth Street where he and Wing engaged in consensual sexual relations. Defendant's and Copley's testimony differ as to what subsequently occurred. Copley testified that at some point during the evening, defendant had asked him if he could "get some" and that Copley had replied, "I don't know if you can get it; you might as well take it. I don't know if she's willing." Copley claimed that after he finished having sex with Wing, defendant proceeded to have sexual intercourse with her. Although Wing resisted, Copley and defendant, alternatively, engaged in sexual intercourse and oral sex with her.

According to Copley, he then said to defendant, "Why don't you get that bitch quiet", and "What the hell are we gonna do with her?". Copley testified that defendant then said, "Why don't we kill the bitch with that pole?" and that Copley responded, "If we have to do it we'll strangle her". Copley claimed that the two men wrapped a sock belonging to defendant around Wing's neck and

strangled her for about four or five minutes. At defendant's suggestion, the two men carried the pole to where Wing was lying, and dropped it on her head three times.

Defendant testified that he awoke in Copley's car to see Wing standing naked at the car door and pulling him to come out. Defendant followed Wing, began to kiss her, and, at Wing's request, engaged in oral sex and sexual intercourse with her. Defendant testified he then walked back toward the car, looked out and observed Copley kneeling on Wing, and then fell asleep in the car.

According to defendant, he was awakened when Copley opened the car door, dropped some clothes inside, and asked defendant to help look for Copley's wallet. As he was looking for the wallet, defendant encountered Wing's body. Defendant asked Copley if he realized what he had done. Copley told defendant not to worry, that he had "done it before". When defendant asked Copley what he meant, Copley explained that he had once killed a man by "shooting him up" with heroin. In response to defendant's question why Copley had never been "busted" for the prior killing, Copley stated he had been in the penitentiary in Ohio.[2]

Later that day, defendant agreed with Copley that, if asked, they would say they "left the bar with Judy and we dropped her in front with some guy". When asked why he agreed to tell that story and why he didn't call the police, defendant explained that he was afraid that the corrections

---

[2] Defendant's testimony concerning Copley's admission of a prior killing was in violation of the trial court's order. Apparently, Copley was arrested in 1975 and charged with manslaughter in the death of a person to whom he had allegedly supplied narcotics, resulting in the person's death. He was ultimately allowed to plead to the misdemeanor offense of maintaining a public nuisance. The trial court ruled in a motion *in limine* that evidence regarding Copley's prior arrest could not be introduced.

center personnel would have "violated" him for not being at work the previous evening, as he had claimed, and of the repercussions of being at the scene of the murder.

Defendant raises three issues on this appeal. After a thorough review of the record, we conclude that none of the assigned errors necessitate reversal.

I

Defendant first contends that the trial court erred in allowing the prosecutor to inquire into defendant's prior drug usage and prison life. The prosecutor had brought a motion *in limine* to prevent defense counsel from inquiring into prior drug usage by Copley which did not result in convictions. The trial court ruled that evidence of drug addiction or usage by Copley or defendant at the time of the crime or at the time of testifying was relevant and admissible, but inquiry into other prior drug usage was not relevant and, therefore, prohibited. In violation of this order, defense counsel examined various witnesses concerning Copley's drug usage, including the circumstances behind Copley's prior arrest for manslaughter, see *infra,* fn 2. In response to defense counsel's action, the prosecutor requested that an investigating officer be permitted to testify that during interrogation defendant had admitted prior drug usage. Defense counsel objected. The trial court ruled:

"I said that if the witness testified, it would be a legitimate subject whether or not the witness was under the influence of drugs at the time he was testifying, or at the time of the occurrence of the crime. That was the area—but at no other time. Despite that fact, you went back and dug up his record of past conduct. There

was a ruling concerning a past criminal record. Despite that record, you subverted the court's [sic] by going into a matter which I had ruled was not relevant.

"Now, if that rule applies to one witness it applies to all witnesses. You opened the door; you are going to suffer the consequences of the draft."

Just prior to defendant's taking the stand, his counsel stated that he wanted the record to reflect that he was going to bring out defendant's prior drug usage on direct examination only in response to the trial court's ruling and that his objection still stood. The prosecutor then explained:

"I would state for the record that when I examine Mr. Pauli, or cross-examine him I will be very careful in my questioning not to place him in a position where he has to admit that he committed prior drug crimes. I would limit my cross-examination to his knowledge of drugs but not necessarily put him in a position where he has to admit that he committed other crimes, other uncharged crimes."

On direct examination, defendant disclosed prior knowledge and usage of drugs and additionally testified concerning two prior convictions for non-drug-related crimes. Defendant never requested that the court suppress the evidence of the latter two convictions. The trial court could hardly have abused its discretion when it was never given the opportunity to exercise it. *People v Jackson,* 391 Mich 323, 336; 217 NW2d 22 (1974). Furthermore, the prosecutor did not exceed the permissible bounds of cross-examination when he inquired into circumstances behind the convictions since such matters were first raised by defense counsel on direct examination. *People v Roger Johnson,* 382 Mich 632; 172 NW2d 369 (1969), *cert den* 397 US 1079; 90 S Ct 1533; 25 L Ed 2d 816 (1970); *People v*

*Thomas Jones,* 73 Mich App 107, 110; 251 NW2d 264 (1976).

We agree with defendant that the trial court erred in ruling that, because defense counsel had impermissibly inquired into Copley's prior drug usage, the prosecution should be allowed to inquire into defendant's prior drug usage. In *People v Hayes,* 410 Mich 422, 425; 301 NW2d 828 (1981), the Michigan Supreme Court disapproved the idea that identical treatment of opposing parties in a criminal prosecution necessarily achieves a fair result.[3] Moreover, defense counsel's violation of the court's prior order did not relieve the court of its responsibility to exercise its discretion to determine whether cross-examination of defendant on this collateral matter was either irrelevant or unfairly prejudicial. *People v MacCullough,* 281 Mich 15, 25; 274 NW 693 (1937). The court's "what's good for the goose is good for the gander" rationale reveals the court's failure to exercise its discretion. *People v Hayes, supra,* p 425.

To the prosecution's credit, however, it refrained from taking advantage of the trial court's erroneous ruling. The prosecutor explained to defense counsel that it would not place defendant in a position where he would have to admit that he committed prior drug crimes. On cross-examination, the prosecutor further limited his questions on this subject to defendant's use of drugs on the evening of the crime. The only other reference to this topic occurred during rebuttal when the prosecutor argued that. defendant's claimed fear of being "violated" for not having been at work as he had reported was belied by his seeming lack of

[3] Although this notion was expressly disapproved in *Hayes, supra,* decided after the date of the trial herein, we believe our jurisprudence never considered symmetry a proper criterion of due process or fairness.

fear of being "violated" for being in the presence
of people whom he knew to be using drugs. The
potential for unfair prejudice created by the trial
court's erroneous ruling was never realized and
the error was, therefore, harmless.

II

Defendant next argues that he was deprived of a
fair trial by four specific examples of prosecutorial
misconduct, namely (1) inquiry into defendant's
failure to testify at his preliminary examination,
(2) improper innuendo concerning rituals of the
motorcycle club to which Copley belonged, (3) im-
proper cross-examination of defendant concerning
his prison life, and (4) the prosecutor's statement
in the jury's presence that he was willing to
stipulate to the admission of the preliminary ex-
amination transcript.

The prosecutor's inquiry into defendant's failure
to testify at his preliminary examination was an
issue raised by defendant in his appeal as of right.
Since the facts before this panel are the same as
were before the prior panel, this Court's previous
disposition of this issue on the merits is the law of
the case and precludes further review of the issue
on this appeal. *People v Douglas,* 122 Mich App
526, 529-530; 332 NW2d 521 (1983). We have al-
ready concluded that the prosecutor's inquiry into
defendant's prison life was proper cross-examina-
tion. The prosecutor's offer to stipulate to the
admission of the preliminary examination tran-
script, although unnecessary, was harmless. The
offer occurred during the prosecutor's attempt to
refresh defendant's memory of Copley's testimony
at the preliminary examination. Since Copley was
the only witness at the preliminary examination
and he had already testified at great length at

trial, the jury could not have been left with the impression that the defense was hiding evidence presented at the preliminary examination.

The fourth allegation of prosecutorial misconduct merits discussion. Both parties attempted to use evidence of Copley's membership in the Iron Coffin Motorcycle Club to their benefit. Defendant elicited testimony from several witnesses, including Copley, that Copley was a member of the club, in an attempt to impeach Copley's credibility. Defendant testified, and the prosecutor acknowledged, that defendant was not a member of the organization.

The objectionable conduct occurred during the prosecutor's cross-examination of Mark McLeod, Copley's roommate and another member of the Iron Coffin Motorcycle Club. Defense counsel objected when the prosecutor asked McLeod to describe a club ritual known as "training". The prosecutor responded that the type of organization to which a witness belongs is relevant to his credibility. Following a lengthy colloquy, the court ruled that the prosecutor could continue with that line of questioning. McLeod explained that some members of the club engaged in training, a practice where "a bunch of guys have sex with a girl".

In his closing argument, the prosecutor argued that Copley had no motive to, by himself, murder Wing because the evidence indicated that throughout the course of the evening she had intended to willingly engage in sex with Copley. The prosecutor theorized that the motive for the murder could only be understood by viewing the murder as the "aftermath of a training exercise".

The prosecutor may argue his theory based on logical inferences drawn from the evidence admitted. *People v Gonyea,* 126 Mich App 177, 188; 337 NW2d 325 (1983), *lv gtd* 418 Mich 956 (1984).

There must, however, be a factual basis for intimations made. *People v Marchese,* 84 Mich App 775, 777; 270 NW2d 687 (1978), *lv den* 404 Mich 806 (1978). In the instant case, there was no evidence that the events of the evening were part of a club ritual or that defendant was a member of the club or even aware of the ritual. The prosecutor attempted to ascribe a motive to defendant which had no evidentiary basis. The trial court erred in overruling defendant's objections to this line of inquiry and to the prosecutor's closing comments. *People v Flanagan,* 129 Mich App 786, 793-794; 342 NW2d 609 (1983).

In *People v Dinsmore,* 103 Mich App 660, 679; 303 NW2d 857 (1981), *lv den* 411 Mich 1071 (1981), this Court agreed with the defendant that the prosecutor improperly ascribed a motive to defendant through questions posed to defense witnesses and cross-examination, but declined to set aside the verdict because it did not affirmatively appear that the error complained of resulted in a miscarriage of justice. Likewise, in this case, although we expressly condemn the permitted interjection of improper innuendo into the trial proceedings, we are convinced that in the absence of such innuendo the jury would nonetheless have found defendant guilty.

Two reasons exist for our belief that the error was harmless. First, Copley's and defendant's testimony established an alternative motive, *i.e.,* the two men murdered Wing to prevent her from reporting that the men had raped her (which may have resulted in defendant's being sent back to prison).[4]

---

[4] In *People v Bairefoot,* 117 Mich App 225, 237; 323 NW2d 302 (1982) (BRONSON, J., *concurring in part and dissenting in part*), I observed that it "is sometimes difficult for me to understand why a prosecutor will risk a facially good case and probably good conviction

More importantly, as defendant emphasizes, the prosecution's case almost entirely rested on convincing the jury that Copley was telling the truth. Thus, the defense strategy was designed to impeach Copley's credibility. In front of the jury, defense counsel elicited (1) the fact of Copley's plea and reduced sentence in exchange for his testimony against defendant, (2) Copley's membership in the motorcycle club, (3) a character witness's opinion of Copley as the type of guy who, "if he gets into a jam, he'd sell his mother down the drain", and (4) (in violation of the court's order) Copley's history of drug usage and the fact that Copley had admitted to previously killing a man. All of the evidence which potentially discredited Copley was revealed to the jury and, nonetheless, the jury believed Copley. We are convinced that if, in spite of the very damaging evidence introduced against Copley, the jury believed him, the jury still would have believed him even if they were not led to think that defendant's motive lay in the "training" ritual.

## III

Defendant finally argues that the trial court's criticism of defense counsel had a chilling effect on defense counsel's performance and prejudiced defendant in the eyes of the jury. We disagree. The trial court's admonishments occurred outside the presence of the jury and were a legitimate response to defense counsel's violations of rulings by the court. Even after being chastised by the trial court, defense counsel vigorously pursued his case.

by untempered closing comments". This is surely one of those times. Considering that the prosecutor was not obligated to establish motive as an element of the crime, *People v DeLeon,* 103 Mich App 225, 228; 303 NW2d 447 (1981), *lv den* 412 Mich 935 (1982), evidence that defendant was motivated by a desire to "silence" Wing was sufficiently persuasive.

Having found no error requiring reversal, defendant's conviction is affirmed.

Affirmed.