PEOPLE v BURRELL

PEOPLE v BROWN

Docket Nos. 64159, 64196. Argued March 10, 1983 (Calendar Nos. 18, 19).—Decided October 17, 1983.

Joe A. Burrell and Jessie Brown were convicted following a bench trial in the Kent Circuit Court, R. Stuart Hoffius, J., of breaking and entering an occupied dwelling, and, following a jury trial, of being fourth-felony offenders. The Court of Appeals, Allen, P.J., and R. B. Burns and T. M. Burns, JJ., in *Burrell* (Docket No. 78-3442) and D. C. Riley, P.J., and M. J. Kelly and Beasley, JJ., in *Brown* (Docket No. 78-2987) affirmed in unpublished opinions per curiam. The defendants appeal, alleging that the stop by the police of the vehicle in which the defendants were riding, their roadside detention, and the search of the vehicle were illegal and that evidence seized should have been suppressed.

In an opinion by Justice Brickley, joined by Chief Justice Williams and Justices Kavanagh, Levin, Ryan, and Cavanagh, the Supreme Court *held:*

A person may not be detained by the police for roadside questioning beyond the scope of a stop of a motor vehicle because of defective equipment, absent at least an articulable basis for suspecting criminal activity.

1. The trial court found that the stop of the defendants' vehicle was justified because of defective equipment. In this case, the trial court is entitled to deference in its resolution of the credibility of witnesses whose testimony conflicted unless clearly erroneous. The information possessed by the trial court at the time of its determination that the stop was lawful does not permit the conclusion that the determination was clearly erroneous. Because the stop was justified by the defective equip-

REFERENCES FOR POINTS IN HEADNOTES

[1-4] 68 Am Jur 2d, Searches and Seizures §§ 39, 41 *et seq.*

Validity under Federal Constitution of warrentless search of automobile. 26 L Ed 2d 893.

Lawfulness of search of motor vehicle following arrest for traffic violation. 10 ALR3d 314.

ment, there was no need for the police to have had an individualized, articulable suspicion of criminal activity.

2. Because Fourth Amendment rights are involved in even a brief detention, the intrusiveness of the police activity must be carefully limited to the circumstances that justify the detention. The detention must have an object, a fact or event which will resolve an officer's reasonable and articulable suspicion, which is ascertainable and near at hand. In this case, the discovery that Brown did not possess an operator's license or vehicle registration following the lawful stop gave rise to a reasonable and articulable suspicion justifying his further roadside detention, the object of which was to determine whether he was licensed and whether the vehicle was stolen. However, once it was determined that Brown was licensed and that the vehicle had not been reported stolen, the suspicion expired. The continued detention of Brown on the ground that Burrell, his passenger, had not been properly identified lacked a reasonable basis for suspicion of criminal activity.

3. Burrell had no obligation to respond to the officers' inquiry regarding his identity. His denial of his true identity without more was insufficient to raise a reasonable and articulable suspicion of criminal activity. Nor did information indicating that Burrell had an extensive arrest record and was suspected, with Brown, of recent burglaries support such a suspicion.

4. The detentions of both defendants were unreasonable. Because all incriminating evidence was derived from the officers' exploitation of the illegal detentions, all evidence should have been suppressed.

Reversed.

1. ARREST — VEHICULAR STOPS — ROADSIDE DETENTION.

A person may not be detained by the police for roadside questioning beyond the scope of a stop of a motor vehicle because of defective equipment, absent at least an articulable basis for suspecting criminal activity.

2. ARREST — VEHICULAR STOPS — ROADSIDE DETENTION.

The intrusiveness of a brief roadside detention of a person by the police following a lawful stop must be carefully limited to circumstances that justify the detention so as not to violate the person's Fourth Amendment rights; the detention must have an object, a fact or event which will resolve an officer's reasonable and articulable suspicion, which is ascertainable and near at hand (US Const, Am IV).

3. ARREST — VEHICULAR STOPS — ROADSIDE DETENTION.

Detention by police officers of the driver of a motor vehicle for brief questioning because of an inability to produce a valid operator's license and vehicle registration following a lawful stop of the vehicle was reasonable; however, the continued detention of the driver, after a determination that he was licensed and that the vehicle was not reported stolen, because a passenger had not properly identified himself to the officers was unreasonable because it could not be justified on the ground that the question regarding the passenger's identity gave rise to a reasonable and articulable suspicion of criminal activity.

4. ARREST — VEHICULAR STOPS — ROADSIDE DETENTION.

A passenger in a motor vehicle stopped by police officers because of defective equipment has no duty to respond to the officers' inquiry regarding his identity, and denial of his true identity without more is insufficient to raise a reasonable and articulable suspicion of criminal activity which will justify the detention of the passenger or the driver of the vehicle beyond the scope of the original stop.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *David H. Sawyer,* Prosecuting Attorney, and *Carol S. Irons,* Chief Appellate Attorney, for the people.

*Victor I. Smedstad* for the defendants.

BRICKLEY, J. We are faced with a stop by the police of the defendants because of defective vehicle equipment followed by a detention at a time when the officers had no articulable basis for suspecting that the detainees had committed a crime.

We hold that a person may not be detained for roadside questioning beyond the scope of a stop, absent at least an articulable basis for suspecting other criminal activity. US Const, Am IV.

I

On December 16, 1977, Kent County Deputy Sheriff W. Phillip Blackport, while on road patrol in the Kentwood area, observed two black males driving slowly in an older model black Oldsmobile at approximately 6:35 p.m. Deputy Blackport was suspicious of the vehicle and its occupants because of its slow speed and because, "prior to that, the month before that, we had had armed robberies involving two black males, and it was either in an older model—there was information that Kentwood and Grand Rapids had robberies, older model, either Buick or Oldsmobile, black over dark or black vehicle, and there were always two black males involved".[1]

Blackport radioed another unit to report the existence of the suspicious circumstances. He turned his vehicle around in an attempt to follow the Oldsmobile, but lost sight of it. He commenced a search.

At 6:57 p.m., Blackport encountered what appeared to be the same vehicle, again going in the opposite direction. Since the driver's side window of the patrol car was now rolled down,[2] he was able to hear that the vehicle had a defective exhaust. He stopped the vehicle for this equipment violation.[3]

After requesting a back-up unit, Blackport approached the vehicle. He was met at the rear of

[1] At the hearing on the motions to suppress the evidence seized incident to the stop filed by defendants, from which this statement of facts is drawn, Blackport freely acknowledged that he had no reason to stop the Oldsmobile when he first sighted it. He also candidly stated that he would have stopped it had the opportunity presented itself.

[2] At the suppression hearing, Blackport testified that his windows were rolled up when he first encountered the vehicle.

[3] MCL 257.707; MSA 9.2407.

the car by defendant Jessie Brown. Blackport requested that Brown display for inspection his driver's license and the registration of the vehicle. Brown informed the officer that he did not have a driver's license in his possession and that the vehicle belonged to a friend. While Brown and defendant Joe Anton Burrell, the passenger in the vehicle, searched the glove compartment for the registration, Blackport radioed a request for a Law Enforcement Information Network (LEIN) check of the vehicle, of Brown, and of "Joe Williams", the name Burrell had given to Blackport.[4]

At 7:10 p.m., Kent County Deputy Sheriff Allen Lee Blanker overheard the LEIN request by Deputy Blackport. The name "Jessie Brown" caused Deputy Blanker to recall briefing information he had received on "house burglary suspects" Jessie Brown and Joseph Burrell. Blanker radioed Blackport that he was en route with a "flier" or "hot sheet" regarding Jessie Brown and Joseph Burrell. Pictures of the two suspects were reproduced along

---

[4] It appears to have been the policy of the Kent County Sheriff's Department to require passengers in a stopped vehicle to identify themselves. The following excerpt from the record of the suppression hearing is instructive.

"*Q. [McWilliams, attorney for Burrell]:* You did ask Mr. Burrell questions?

"*A. [Deputy Blackport]:* I asked Mr. Burrell his name, but prior to issuing the citation, to run LEIN on it.

"*Q.* What was the purpose of that?

"*A.* To find out who he was. He said his name was Joe Williams.

"*Q.* Why would you need to get verification on that? He wasn't driving the vehicle, was he?

"*A.* No, sir, but passengers in the vehicle are normally required to identify themselves.

"*Q.* Are you aware of any legal requirement that they do so?

"*A.* No, not personally.

"*Q.* And as far as Mr. Brown's ticket for driving without his operator's license, and as far as the defective exhaust, there was no connection with Mr. Burrell at all? Those things solely concerned the driver of the vehicle and the owner of the vehicle, correct?

"*A.* Yes."

the top border of the sheet. Blanker testified that he suspected that "Joe Williams" was Joe Burrell. Blanker arrived at the scene of the stop between 7:10 and 7:15 p.m.

Upon arrival, Blanker conferred with Blackport and Deputy Ed Westhouse, Blackport's back-up. The officers noted that the pictures of Brown and Burrell resembled Brown and "Williams". Blanker then walked up to "Joe Williams" and said, "I thought your name was Joe Burrell." Burrell replied, "No, my name is Joe Williams." Blanker relayed this denial to Blackport and Westhouse.

On the basis of Burrell's denial and the picture on the "hot sheet", the officers decided to detain Burrell for investigation and possible arrest for giving false information to a police officer.[5]

By 7:15 p.m., the LEIN check was completed, and no adverse information was obtained. There were no "wants" or warrants for Brown or "Williams". There was no report that the vehicle had been stolen. In addition, it was learned that Brown had been issued an operator's license which was still valid.

At approximately 7:20 p.m., Blanker requested that his supervisor, Sergeant DeBold, come to the scene. DeBold instructed the officers to pat-search the defendants and to detain them in Deputy Westhouse's vehicle. DeBold arrived by 7:25 p.m.

[5] Blackport described a "hot sheet" as follows: "A hot sheet isn't a reason to arrest somebody. It depends on what's on it."

There appeared to be no doubt in the minds of the officers that "Joe Williams" was Joe Burrell. There certainly was no speculation that "Joe Williams" might be someone other than Burrell. Blackport had concluded that the picture of "Joe Anton Burrell matched the man who identified himself as Joe Williams". "The picture of Joe Anton Burrell * * * looked exactly like the man who identified himself as Joe Williams." Blackport testified that it was his intention to arrest Burrell for giving false information to a police officer if he could get "positive proof" of Burrell's identity. The detention, then, was to facilitate positive identification.

and took command of the investigation. Sometime after the defendants were detained in the back of Westhouse's vehicle, but before Blanker left the scene to investigate a reported breaking and entering, Westhouse, in the presence of Blanker, allegedly asked Brown if he could "look inside the car".[6] Brown reportedly consented to the search.[7]

At 7:30 p.m., a citation was issued to Brown for failure to have a valid operator's permit in his possession while driving a vehicle,[8] and he was specifically informed that he would not be allowed to leave the scene until a positive identification of his passenger could be obtained. He was further informed that he and Burrell were to be transported to the station house because, in the words of Deputy Blackport, "we were intending on taking him down for pictures and prints so we could obtain a positive identification of both subjects because we believed that we didn't know for sure if Jessie Brown was Jessie Brown, and we believed Joe Williams was Joe Anton Burrell". However, the officers did not leave the scene of the stop because they were informed that Detective Brown from the Walker City Police Department could positively identify Brown and Burrell. The officers requested that Detective Brown proceed to the scene. Detective Brown arrived shortly after 8:00 p.m.

At 7:41 p.m., Deputy Blanker was dispatched to investigate a breaking and entering at a nearby residence. Upon arrival at the residence, he was

---

[6] The quoted words are Deputy Blanker's. Deputy Westhouse did not testify at the suppression hearing.

[7] Brown denied that he consented to the search. The trial court found otherwise. It is not altogether clear what items were removed from the vehicle. In any event, the items which served as the basis for these prosecutions were not. See below.

[8] MCL 257.311; MSA 9.2011.

informed that two Christmas presents wrapped in "Mickey Mouse wrapping paper" had been stolen. Blanker recalled seeing packages similarly wrapped in Brown's car. He alerted his radio supervisor at approximately 7:50 p.m. about this similarity and requested that the complainant accompany him to the scene of defendants' detention to identify the packages in the back of the Oldsmobile. Arriving at 8:00 p.m., the complainant was instructed to look into the car. There he observed, "jammed under the seat", two gift-wrapped packages similar to those which had been removed from his home.

Between 8:00 and 8:30 p.m., Kent County Detective Lieutenant Jack Christensen arrived on the scene and took charge of the investigation. Christensen had been attending the Kent County Sheriff's Department annual ball. He had been kept informed of the progress of the unfolding investigation by periodic phone calls. He recalled being told sometime between 7:30 and 8:00 p.m. that two as yet not positively identified suspects of a house burglary were being detained. He had instructed the officers "to make absolutely certain they knew who they had out there before they let anyone go". Christensen left for the scene of defendants' detention when he learned that a complainant had been found.

The complainant was later returned to the scene so that he could identify the packages in the presence of Christensen. The packages were still in the Oldsmobile. At 8:30 p.m., defendants were read their *Miranda*[9] warnings, and they were questioned about their possession of the packages.

Defendants were arrested and charged with breaking and entering an occupied dwelling

[9] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

house.[10] Informations were filed charging defendants as fourth-felony offenders.[11] Defendants' motions to suppress evidence seized incident to the stop were denied. On March 28, 1978, each defendant was convicted of the breaking and entering offense by the trial court, sitting without a jury. Immediately thereafter, the defendants were arraigned on the supplemental information. Motions for a new trial were denied. On May 9, 1978, each defendant was sentenced to a term of from 10 to 15 years imprisonment.

On June 8, 1978, each defendant was found guilty by a jury under the supplemental information of having been convicted of four felonies. On June 20, 1978, the trial court entered an order vacating the breaking and entering convictions in these cases because defendants had been convicted of being fourth-felony offenders.[12] Each defendant was sentenced for a period of 20 to 40 years imprisonment.

The Court of Appeals affirmed defendants' convictions in unpublished opinions per curiam.

We granted leave to appeal.[13]

## II

Defendants raise issues of constitutional stature about their stop and detention for roadside questioning.[14] As to the stop, defendants claim that the

[10] MCL 750.110; MSA 28.305.

[11] MCL 769.12, 769.13; MSA 28.1084, 28.1085.

[12] We assume that the order vacating defendants' *convictions* was due to a clerical mistake. See MCL 769.13; MSA 28.1085.

[13] "The parties are directed to include among the issues to be briefed whether the trial court ought to have granted defendant's motion to suppress the evidence obtained as a result of the detention of defendant and the search of the automobile."

Identical orders entered for each defendant. 409 Mich 948 (1980).

[14] Defendants were at all times before the trial court treated as codefendants.

motivation for the original stop of the vehicle was racial (two black men driving slowly in a dark automobile in a white suburb of Grand Rapids) and not because of defective equipment. Defendants contend that the conclusion that the stop was pretextual and that the inference that the stop was racially motivated is compelled by the fact that no citation was ever issued for the noisy exhaust system. Defendants further argue that the 90-minute roadside detention for questioning which preceded their arrest and during which their vehicle was searched was impermissible because they were held without cause to believe either that a crime had been committed or that they had committed a crime. Thus, defendants aver that the stop and the detention were violative of their Fourth Amendment rights to be free from unreasonable seizure and unreasonable search,[15] and that, since the seizure and the search were illegal, evidence obtained as a result ought to have been suppressed.

This Court will not disturb a trial court's ruling at a suppression hearing unless that ruling is found to be clearly erroneous. Resolution of facts about which there is conflicting testimony is a decision to be made initially by the trial court. The trial judge's resolution of a factual issue is entitled to deference. This is particularly true where a factual issue involves the credibility of the witnesses whose testimony is in conflict. *People v*

---

[15] The Fourth Amendment provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The Fourth Amendment was made applicable to the states through the Fourteenth Amendment in *Mapp v Ohio,* 367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961).

*White,* 401 Mich 482; 257 NW2d 912 (1977). See *People v Dinsmore,* 103 Mich App 660; 303 NW2d 857 (1981).

Proper evaluation of defendants' claim obliges us to review the information known to the trial court at the time it denied defendants' motions to suppress the evidence. Since the claimed error here involves deprivation of a constitutional right, our resolution of the issue is "guided but not controlled by the trial judge's factual determination". *People v Smith,* 19 Mich App 359, 367-368; 172 NW2d 902 (1969). If, upon our review of the record, we do not possess a definite and firm conviction that the trial court made a mistake, we must affirm. *People v White, supra.*

In the instant suppression hearing, it was disputed whether the Oldsmobile had a loud muffler. This is the basis for defendants' claim that the stop was racially motivated. Deputy Blackport, and later Detective Christensen, stated that they heard a loud muffler. Defendant Brown disagreed. The trial court found that Deputy Blackport heard a loud muffler. Since the trial court was in a superior position to judge the credibility of these witnesses and since we are unable to conclude that the trial court clearly erred in the determination that there was a loud muffler, we assume that the original stop of the vehicle was lawful.

Although no citation was issued for the defective exhaust system, we are unable to conclude that Blackport abused his discretion as a police officer in failing to issue a citation for the defective equipment violation. Blackport also did not cite Brown for driving a motor vehicle without a registration,[16] as he certainly could have done. It follows immediately that the fact that Blackport

---

[16] MCL 257.223; MSA 9.1923.

chose to cite Brown for driving without a driver's license in his possession instead of a defective muffler does not necessarily support the inference that the original stop was racially motivated.

The constitution requires an "individualized, articulable suspicion" for a stop in the absence of traffic or equipment violations. *Delaware v Prouse,* 440 US 648, 662; 99 S Ct 1391; 59 L Ed 2d 660 (1979); *United States v Brignoni-Ponce,* 422 US 873; 95 S Ct 2574; 45 L Ed 2d 607 (1975). Here the stop was justified because of defective equipment, as found by the trial court and which we accept. We feel constrained to add, however, that a stop cannot be justified by individualized, articulable suspicion when a police officer merely observes two black men in a dark automobile driving slowly through a white or predominantly white community and recalls that armed robberies occurred the month before which were allegedly committed by two black males in a dark vehicle.[17]

On the facts presented, we conclude that defendants' argument that the stop was pretextual is without merit.

Defendants' argument with respect to the impermissible scope of the roadside detention is more problematic. If it is assumed that the stop was justified, then at least some part of the detention was justified. The question is at what point, if ever, did the detention become an impermissible violation of the defendants' Fourth Amendment rights?

Briefly, defendants claim that the detention was impermissible because it lacked probable cause. Relying on *People v Grimmett,* 97 Mich App 212; 293 NW2d 768 (1980), which cites *Adams v Williams,* 407 US 143, 146; 92 S Ct 1921; 32 L Ed 2d

[17] Contrast with *People v Ulrich,* 83 Mich App 19; 268 NW2d 269 (1978).

612 (1972), and *People v Harold Williams,* 63 Mich App 398, 403; 234 NW2d 541 (1975), the people counter that detention is appropriate to determine identity.[18]

---

[18] In *Grimmett,* the defendant, a young black male, was stopped by the police who were seeking suspects in a stolen property ring and had warrants for approximately 130 persons, many of whom were young black males. The police asked the defendant for his name and destination. When the police determined that the defendant was not wanted for any involvement in the stolen property ring, the defendant was allowed to proceed. While walking away from the police, the defendant was observed to be carrying an object which appeared to be a small handgun. The suspicions of the police were aroused. They approached the defendant a second time to inquire about what he was trying to hide. A vial of heroin was discovered. The defendant's conviction was affirmed, the original stop justified by the warrant, and the subsequent stop justified by "[a] new, unrelated set of circumstances". 97 Mich App 215.

In *Adams v Williams,* a police officer was approached by an un-named informant known to him and informed that a person seated in a nearby vehicle was carrying narcotics and had a handgun at his waist. Suspicions aroused, the officer approached the vehicle to investigate. When the occupant rolled down the car window instead of opening the door, the officer reached into the car and removed a fully loaded revolver from the occupant's waistband. In affirming the defendant's convictions of illegal possession of a handgun and possession of heroin, the Court noted: "A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." 407 US 146. The credibility of both the informant and the information imparted supplied the officer with reasonable, articulable suspicion.

In *People v Harold Williams,* the police were summoned to a motel to investigate a report by the manager that there were "suspicious" men in the motel parking lot. The police were directed to the defendant, who was seated alone in an automobile parked in the lot. The vehicle's motor was not running. The lights were off. The officers asked the defendant to identify himself. The defendant got out of the vehicle, produced a wallet, and gave one of the officers a business card, while claiming that he had no other identification. The defendant was asked to check his wallet again. While the defendant was thumbing through the wallet, one of the officers observed the top part of an operator's license. The officer seized the wallet and discovered that the names on the business card and the driver's license did not match. The defendant was not able to explain the discrepancy. The officer then continued his investigation of the wallet and discovered credit cards with still other names. The defendant was arrested and charged with a credit card offense, MCL 750.157n; MSA 28.354(14). Defendant's motion to suppress the evidence seized was denied. The Court of Appeals based its reversal on an illegal search of the

The people argue that a detention does not rise to the level of a formal arrest and that its constitutionality is to be tested against a standard of reasonableness. Reasonableness "depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers". *United States v Brignoni-Ponce, supra,* p 878, cited with approval in *Pennsylvania v Mimms,* 434 US 106, 108-109; 98 S Ct 330; 54 L Ed 2d 331 (1977).

The people advance five facts in support of the reasonableness of this detention: (1) neither occupant was the registered owner of the vehicle, nor did either produce a copy of the registration; (2) the true owner could not be contacted; (3) neither of the occupants had any identification; (4) the passenger identified himself with a fictitious name; and (5) the driver of the vehicle was cited for driving without a license. The people argue that detention under these circumstances was appropriate to determine if the car was stolen. In addition, the people conclude that even if defendant Burrell's detention was illegal under a reasonableness standard the evidence against him is derived from a constitutionally reasonable detention of defendant Brown.

The problem with the people's argument is that it treats two detentions as one, an admittedly

defendant's wallet at a stage in the investigation when the officers did not have probable cause or consent to search. The Court noted that detention may be permissible to request identification or to explain suspicious circumstances. However, the Court cautioned that field interrogation might prove inconclusive in resolving an officer's suspicions. Absent escalating suspicion, continued detention was unjustified.

None of these cases supports the bare assertion that detention is appropriate to determine identity. To the extent that a rule common to all may be distilled, detention to determine identity is appropriate, given suspicious circumstances which justify the officer's intrusion on an individual's freedom of movement and personal security.

reasonable detention pursuant to the initial stop and a second detention based on Burrell's false statement. We treat each in turn.

Once the vehicle was properly stopped at 6:57 p.m., it took Deputy Blackport a somewhat incredible 33 minutes to issue a citation to Brown for failure to have a valid driver's license in his possession. Approximately half of that time was consumed in running a LEIN check on both the defendants and the vehicle. By 7:15 p.m., the LEIN checks were negative, and Deputies Westhouse and Blanker had arrived at the scene. By 7:20 p.m., it was decided that "Williams" (Burrell) had given false information to a police officer and was to be detained for investigation, if not arrest, Brown along with him. By 7:25 p.m., defendants were pat-searched and detained in Deputy Westhouse's vehicle.

Analytically, given this state of facts, it is clear that more than one roadside detention occurred. Initially, driver Brown was properly stopped for an equipment violation. A detention following a stop for such a minor violation would be justified only for the length of time necessary to write a citation. Here, however, the stop immediately revealed a new set of circumstances, a driver without either an operator's license or a vehicle registration. We agree that it was reasonable to suspect that the vehicle was stolen, and we also agree that detention was justified long enough to resolve the suspicion raised. When the LEIN check verified that Brown was licensed and that the car was not reported as stolen, that suspicion expired. By 7:15 p.m., detention, again, could be justified only for the length of time required for Blackport to write a citation for Brown's failure to have a valid driver's license in his possession while driving.

Burrell's false statement was the basis for the second detention. By 7:20 p.m., a decision was made and executed to detain Burrell for giving false information to a police officer. Shortly thereafter, Brown was informed that he too was detained until his passenger could be properly identified. Although Brown had not yet been issued a citation, the justification for his detention changed as of the moment that a determination was made to detain him until a proper identification of Burrell could be made.[19] Moreover, once it was determined to hold Brown until Burrell could be identified, Brown's detention became linked to Burrell's detention. Thus, if it should be concluded that Burrell's detention was unreasonable, then Brown's detention became unreasonable when the officers made his freedom dependent on Burrell's freedom.[20]

Presented from this perspective, the people's analysis of factors which justified Burrell's detention collapses: (1) it is altogether unsurprising that a passenger of a vehicle is not its registered owner or is unable to produce a copy of the vehicle's registration; (2) the fact that the police are unable to contact the registered owner is rarely a matter

[19] The people argue that defendant Brown was properly detained until Deputy Blackport "otherwise satisfactorily determine[d]" his identity. See MCL 257.727; MSA 9.2427. We do not disagree. The people then argue that Brown was not satisfactorily identified to Blackport until at least 7:30 p.m., hence his continued lawful detention. The facts do not support this view. By 7:15 p.m., Blackport had started writing the citation for Brown. In addition, there was no dispute among the officers that Brown was Brown. Nor was there any dispute that the picture of Jessie Brown on the flier, blurred as it was, prevented identification. Arrayed against all of this, we are unpersuaded that Blackport's lone statement of doubt as to the identity of Brown represents more than a rationalizing response to a difficult question posed by counsel for Burrell at the suppression hearing.

[20] The officers created this unusual circumstance. We express no opinion as to the validity of the converse of this proposition.

of moment in respect to a passenger; (3) it is unremarkable that a passenger in an automobile would not have a driver's license or any other form of identification; (4) when asked, a passenger is under no obligation to identify himself;[21] and (5) the fact that the driver of the vehicle has been cited for driving without a license does not reflect adversely on the passenger of the vehicle.[22]

In sum, the people argue that the officers were provided a reasonable basis for their suspicion that criminal activity was afoot by their observation of a passenger in a vehicle which had been stopped for defective equipment and whose driver did not possess a driver's license or registration, such passenger apparently being unwilling to truthfully identify himself. We disagree.

In *Brignoni-Ponce, supra,* 422 US 881-882, the United States Supreme Court applied the *Terry*[23] "stop and frisk" doctrine to investigatory stops of automobiles by a roving border patrol. The Court condemned a random stop of a vehicle made because its three passengers appeared to be of Mexican descent. The Court concluded that appearance alone was an insufficient basis to allow a random stop and brief questioning. This result flowed naturally from the *Terry* requirement that more than "inchoate and unparticularized suspicion or 'hunch' " was necessary to justify a frisk of a suspicious individual. The Court held

"that when an officer's observations lead him reasonably to suspect that a particular vehicle may contain

---

[21] The people do not cite any statute which makes it a crime to make an unsworn false statement to a police officer. Nor have we been able to find such a statute.

[22] See the last question and Blackport's reply in the excerpt from the suppression hearing quoted in fn 4.

[23] *Terry v Ohio,* 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968).

aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion. As in *Terry,* the stop and inquiry must be 'reasonably related in scope to the justification for their initiation'. 392 US 29. The officer may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause."

The Court thus articulated a standard of reasonable suspicion based upon an officer's observations, such observations being tempered by his experience. Should reasonable suspicion be aroused, an investigatory stop was authorized for brief questioning.

In *Delaware v Prouse, supra,* the Court required that a police officer who stops and detains a motorist to check for a valid driver's license and registration have at least an articulable and reasonable suspicion that the motorist is unlicensed or that the vehicle is not registered. The officer in the case testified that he had not observed traffic or equipment violations or any suspicious activity prior to making the stop. The Court ruled that his stop was unreasonable.

In the instant case, we do not deal with an improper stop. Therefore, neither *Brignoni-Ponce* nor *Delaware v Prouse* is dispositive. However, since a stop almost inevitably leads to a brief detention for questioning, we draw guidance from these decisions as to the standard applicable to a brief detention *on an unrelated matter* following an otherwise lawful stop. Proceeding from the premise that a brief detention is at least as intrusive for Fourth Amendment purposes as a stop, we conclude that a brief detention for questioning is

permissible if based on a reasonable and articulable suspicion of criminal activity.[24]

Since Fourth Amendment rights are involved in a detention, however brief, the intrusiveness of the police activity must be carefully limited to the circumstances justifying the detention. Put another way, the detention must have an object (that fact or event which will resolve a police officer's reasonable and articulable suspicion) which is ascertainable *and* near at hand. This is as true for a brief detention associated with a LEIN check to determine if a car is stolen as it would be for a longer detention when, as examples, suspicion is escalating or a crime has just been committed, a partial description is broadcast, and time is needed to sort out rapidly developing circumstances.[25] Such a standard presumes individualized suspicious circumstances not found in Burrell's detention.

In the instant case, the testimony of all the officers is consistent with generalized suspicion or hunch. The officers "suspected" that "Joe Williams" was Joe Burrell. The officers were in possession of a "hot sheet" which informed them that Burrell had an "extensive arrest record" and was suspected, along with Jessie Brown, of having committed recent house burglaries in northwest Grand Rapids. Deputy Blackport himself stated that this "hot sheet" was not a reason to arrest

---

[24] In *People v Freeman,* 413 Mich 492, 496; 320 NW2d 878 (1982), this Court, relying on the decisions in *Brignoni-Ponce* and *Delaware v Prouse,* concluded that "[a] lone automobile idling in a darkened parking lot late at night does not, without more, support a reasonable suspicion of criminal activity". It was not decisionally necessary in *Freeman* to reach the detention issue presented. As a result, it was unnecessary to decide if, unlike the constitutional requirements for a stop, detention for roadside questioning is permissible when based only on an officer's inchoate and inarticulable suspicion or hunch.

[25] See *Michigan v Summers,* 452 US 692, 700-701, fn 12; 101 S Ct 2587; 69 L Ed 2d 340 (1981).

someone.[26] There were no "wants" or warrants pending for the arrest of Burrell or for Brown. The officers had apparently observed gift-wrapped packages on the floor of the rear passenger area of the vehicle, a fact which should occasion little surprise since Christmas was nine days away, and new shoes on the floor board in front of defendant Burrell's seat, a fact consistent with Christmas shopping for oneself.[27]

No specific reasonable inferences of criminal activity could possibly be drawn from these facts. Even assuming, by hypothesis, that these facts do support reasonable, articulable suspicion, we are forced to confront the question, where does it lead? Here the stated objective for the detention was to confirm Burrell's identity, presumably because Burrell was suspicious.[28] What must be remembered is that it was not a crime for "Joe Williams" to be Joe Burrell or, for that matter, for Joe Burrell to be Joe Burrell. Absent any statutory provision to the contrary, Burrell was under no obligation to even respond to the question, much less to respond truthfully. *Terry v Ohio, supra* (concurrence by White, J.). We do not condone a detention of one person on the articulable suspicion that he is someone else, about whom there are only inarticulable suspicions.

We conclude on these facts that the detention of Joe Anton Burrell was not supported by any reasonable and articulable suspicion of criminal activity. Since Burrell's detention was constitutionally

---

[26] See fn 5.

[27] Contrast with *People v Damaska*, 404 Mich 391; 273 NW2d 58 (1978).

[28] The basis for the detention could not have been the "hot sheet". It should be recalled that the officers were apparently satisfied that Jessie Brown was the Jessie Brown of the "hot sheet" and were apparently prepared to free him—subject to Burrell's positive identification.

unreasonable, Jessie Brown's derivative detention was equally constitutionally unreasonable.

We are not unmindful that the result of our decision today is the suppression of otherwise good and highly incriminating evidence that led to the defendants' convictions of breaking and entering a private dwelling, and that these convictions became the basis for fourth-offender convictions, resulting in substantial sentences. That painful consequence is balanced by the fact that it is only in difficult situations such as those presented here that we can draw the fine lines between the authority of the police to protect us from crime and the use by the police of governmental power to violate our constitutional rights. Here, defendants were linked to the criminal activity which led to their convictions no sooner than 7:50 p.m., long after defendants were detained and even long after Blackport had completed his work connected with the original stop. Such is an impermissible use of the power to briefly detain. By analogy, rather than having a crime and looking for the criminals, the police, here, had the "criminals" and were looking for the crime.

We have reviewed the record in this case and evaluated the information known to the trial judge when he made his decision to deny defendants' motions to suppress the evidence seized incident to the stop. On the basis of our review, we are left with a definite and firm conviction that a mistake was made. We are unable to find specific facts which would support a reasonable suspicion of criminal activity. Since all evidence of an incriminating nature was derived from the police officers' exploitation of the illegal detention of Burrell and

Brown, all the evidence should have been suppressed.[29]

Reversed.[30]

WILLIAMS, C.J., and KAVANAGH, LEVIN, RYAN, and CAVANAGH, JJ., concurred with BRICKLEY, J.

BOYLE, J., took no part in the decision of this case.

---

[29] See *Wong Sun v United States,* 371 US 471; 83 S Ct 407; 9 L Ed 2d 441 (1963).

[30] In light of our decision in this case, the other issues which defendants raise need not be addressed.