## PEOPLE v MARTINEZ

Docket No. 114122. Submitted September 13, 1990, at Grand Rapids. Decided January 22, 1991, at 10:00 A.M.

Gilbert Martinez, also known as Roy Sotto Puente, pleaded guilty in the Berrien Circuit Court, Ronald J. Taylor, J., of one count of possession of more than 50 grams, but less than 225 grams, of cocaine, and was sentenced to thirteen to twenty years' imprisonment. The defendant's plea was conditioned upon the right to raise on appeal the issue whether the search of a vehicle in which he was a passenger, which resulted in the discovery of the controlled substance, was valid. The defendant appealed.

The Court of Appeals *held:*

The search without a warrant was lawful. The trial court properly denied the defendant's motion to suppress the evidence.

1. A police officer, consistent with US Const, Am IV, may order a passenger to get out of a motor vehicle during a routine traffic stop under circumstances in which the officer may order the driver to get out of the vehicle. Because the officer in this case was permitted to order the defendant passenger to get out of the vehicle, he properly was in a position to observe a handgun in plain view in a bag in the passenger compartment.

2. The search without a warrant of the bag containing the handgun and a large sum of currency provided the officers with probable cause to believe that other weapons, contraband, or evidence of a crime could be found in another container in the vehicle. The further search without a warrant of a garment bag in the bed of the vehicle was reasonable under the automobile exception to the warrant requirement. The trial court did not clearly err in determining that the search of the garment bag, and discovery of the cocaine, was proper.

Affirmed.

REFERENCES

Am Jur 2d, Searches and Seizures §§ 16, 23, 39, 96, 99.

Validity of seizure under Fourth Amendment "plain view" doctrine — Supreme Court cases. 75 L Ed 2d 1018.

Lawfulness of search of motor vehicle following arrest for traffic violation. 10 ALR3d 314.

NEFF, J., dissenting, stated that extending the rule that a police officer can order a driver to get out of a vehicle after a routine traffic stop, even though the officer does not have any reason to be in fear for his safety or to suspect criminal activity, to include a passenger in the vehicle is an unwarranted violation of the Fourth Amendment, requiring reversal and remand for entry of an order suppressing the evidence.

1. SEARCHES AND SEIZURES — AUTOMOBILES — ROUTINE TRAFFIC STOPS — PASSENGERS AND DRIVERS.

A police officer, for reasons of safety, may request a driver or a passenger to step from a vehicle and off onto the shoulder of the road during a routine traffic stop (US Const, Am IV).

2. SEARCHES AND SEIZURES — WITHOUT WARRANTS — AUTOMOBILES — PROBABLE CAUSE.

The search of an automobile without a warrant is reasonable where the automobile legitimately has been stopped by a police officer and the officer has probable cause to conduct the search, i.e., where the facts and circumstances would warrant a person of reasonable prudence to believe that the vehicle contains evidence of a crime or contraband; if a search is so justified, it may include every part of the vehicle and its contents that may conceal the object of the search.

*Frank J. Kelley,* Attorney General, *Gay Secor Hardy,* Solicitor General, *Dennis M. Wiley,* Prosecuting Attorney, and *Margaret A. Penninger,* Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Kim Robert Fawcett*), and Gilbert Martinez, in propria persona.

Before: WEAVER, P.J., and SAWYER and NEFF, JJ.

SAWYER, J. Defendant pled guilty of one count of possession of more than 50 grams, but less than 225 grams, of cocaine, MCL 333.7401(2)(a)(iii); MSA 14.15(7401)(2)(a)(iii), and was sentenced to serve a term of thirteen to twenty years in prison. He now appeals and we affirm.

Defendant's guilty plea was conditioned upon the right to raise on appeal the issue whether the

search which disclosed the controlled substance was valid. The issue whether the search was lawful represents defendant's sole issue on appeal. For the reasons to be discussed below, we conclude that the trial court did not err in not suppressing the evidence pursuant to the Fourth Amendment of the United States Constitution.

On the afternoon of October 27, 1987, Harry Lenardson, Chief of Police of the City of Bridgman, was patrolling I-94 in Berrien County when he observed a white pickup truck travelling westbound at a high rate of speed, emitting excessive smoke. Chief Lenardson then activated his overhead lights and pulled the pickup over. It is not disputed that this was a valid traffic stop. Chief Lenardson testified at the preliminary examination that his original intent was to issue a citation for the excessive smoke and to give a warning concerning the speed.

Chief Lenardson approached the vehicle and requested the driver, Victor Rodriguez, to produce his driver's license. Rodriguez informed Chief Lenardson that he did not have his driver's license with him and, in response to the chief's inquiry whether he had any kind of identification, produced various documents, apparently including a proof of insurance. At this point, Chief Lenardson requested Rodriguez to get out of the vehicle and accompany him back to the squad car. According to Chief Lenardson, at that point he had not yet made a decision regarding whether he was going to arrest Rodriguez for having no operator's license in his possession or merely issue a citation and release him. Apparently, the chief intended to further investigate the matter before reaching a decision.

While Chief Lenardson was in his squad car, with Rodriguez seated next to him in the front seat, Berrien County Deputy Sheriff Jamie Lenard-

son arrived at the scene.[1] Chief Lenardson asked
Deputy Lenardson to go to the pickup truck and
ask the passenger to identify himself. Meanwhile,
Chief Lenardson called the dispatcher and re-
quested a check to determine if Rodriguez had a
driver's license.[2] While Chief Lenardson was wait-
ing for a response to the radio call, he heard his
son shout to him, "they have got a gun," and he
saw his son draw his service revolver out and
point it at defendant. Chief Lenardson then left
his vehicle and went around and pulled Rodriguez
out of the squad car, patted him down, handcuffed
him, and placed him in the back seat of the squad
car. Chief Lenardson observed Deputy Lenardson
handcuff defendant and put him in the rear of the
deputy's squad car.

Deputy Lenardson testified that he approached
the passenger side of the truck to obtain defen-
dant's identification pursuant to Chief Lenardson's
request. The deputy asked defendant, who later
identified himself as Gilbert Martinez, for identifi-
cation, and defendant indicated that he did not
have any. At this point, Deputy Lenardson re-
quested defendant to step from the vehicle, which
defendant did. Defendant apparently indicated to
Deputy Lenardson that he did not have any identi-
fication because he had lost his wallet. Deputy
Lenardson testified that he requested defendant to
get out of the vehicle for the deputy's own safety
and that it was his standard practice in every
traffic stop to have the individuals involved get out
of the vehicle. After defendant got out of the
vehicle, Deputy Lenardson looked inside the vehi-
cle and saw a green leather bag lying on the
passenger side floorboard.

[1] Deputy Lenardson is the son of Chief Lenardson.

[2] At this time, Rodriguez apparently indicated that he had left his
driver's license in Texas. The vehicle driven by Rodriguez had Texas
license plates.

According to Deputy Lenardson, the bag was partially open, and from his position he could see a plastic baggie tightly wrapped around what appeared to be a handgun. The deputy then reached inside the vehicle and into the bag and felt the handgun inside the plastic baggie. At this point, Deputy Lenardson yelled to Chief Lenardson that he had found a gun, drew his service revolver, and placed defendant against the side of the pickup truck. Deputy Lenardson then patted down defendant and asked him whether he had a permit for the weapon, to which defendant replied that he did not. Deputy Lenardson then handcuffed him and started to walk him back to the patrol car. While walking to the patrol car, he asked Rodriguez whether he had a permit for the weapon, and Rodriguez responded that he did not.

After defendant was placed in the rear of Deputy Lenardson's vehicle, and Rodriguez was secured in the rear of Chief Lenardson's vehicle, both officers returned to the pickup truck to conduct a further search. Deputy Lenardson indicated to Chief Lenardson that, in addition to finding the handgun, he had observed four packets containing large sums of money.[3] Deputy Lenardson again returned to the passenger compartment of the vehicle and to the green leather bag and confirmed the presence of the handgun and the money. Meanwhile, Chief Lenardson went to the open bed of the pickup truck and searched a garment bag, which was in the bed of the pickup truck near the tailgate and apparently closed. Inside the garment bag, Chief Lenardson found approximately one

[3] It is not entirely clear from Deputy Lenardson's testimony exactly when the amount of money involved was determined. However, the deputy apparently did determine on his initial investigation that there was a large number of bills in white envelopes in denominations of twenty, fifty, and one hundred. The total amount involved was approximately $10,000.

pound of cocaine. The officers then returned to their vehicles and informed Rodriguez and Martinez that, in addition to being under arrest for carrying a concealed weapon, they also were under arrest for possession of narcotics. It also should be noted that the weapon seized, a nine-millimeter Walther PPK-S semiautomatic pistol, was unloaded, and apparently no ammunition for the weapon was ever recovered.

On appeal, defendant argues that the search without a warrant, which yielded the cocaine, was unlawful and that the trial court erred in failing to suppress the evidence. Specifically, defendant argues that Deputy Lenardson was without authority to request defendant to get out of the vehicle and, therefore, never should have been in a position to observe the handgun and that, in any event, the subsequent search without a warrant of the garment bag in the bed of the truck, which yielded the cocaine, was unlawful, even if the officers' conduct up to that point was authorized. We disagree.

The first question to be answered is whether Deputy Lenardson was authorized to request defendant, as a passenger in the vehicle, to step out of the vehicle. This appears to pose a question of first impression in Michigan, though the United States Supreme Court has addressed the question whether an officer during a routine traffic stop may ask a driver to step from a vehicle.[4] In *Penn-*

---

[4] Since Const 1963, art 1, § 11 precludes the suppression of evidence of any drug or firearm seized outside the curtilage of a dwelling, our inquiry is limited to the question whether the search was lawful under the Fourth Amendment of the federal constitution. Accordingly, we need not determine whether the Michigan Constitution would afford a suspect greater rights in this area than does the federal constitution. See *People v Harmelin,* 176 Mich App 524; 440 NW2d 75 (1989), cert gtd on other grounds sub nom *Harmelin v Michigan,* — US —; 111 S Ct 337; 109 L Ed 2d 742 (1990). Specifically, we need not determine whether a police officer, under the Michigan

*sylvania v Mimms,* 434 US 106, 110-111; 98 S Ct
330; 54 L Ed 2d 331 (1977), the Supreme Court
held that a police officer may request a driver
during a routine traffic stop to step from the
vehicle and off to the shoulder of the road:

> We think it too plain for argument that the
> State's proffered justification—the safety of the
> officer—is both legitimate and weighty. "Certainly
> it would be unreasonable to require that police
> officers take unnecessary risks in the performance
> of their duties." *Terry v Ohio,* [392 US 1, 23; 88 S
> Ct 1868; 20 L Ed 2d 889 (1968)]. And we have
> specifically recognized the inordinate risk confront-
> ing an officer as he approaches a person seated in
> an automobile. "According to one study, approxi-
> mately 30% of police shootings occurred when a
> police officer approached a suspect seated in an
> automobile. Bristow, *Police Officer Shootings—A
> Tactical Evaluation,* 54 J Crim L C & P S 93
> (1963)." *Adams v Williams,* 407 US 143, 148, n 3
> [92 S Ct 1921; 32 L Ed 2d 612 (1972)]. We are
> aware that not all these assaults occur when issu-
> ing traffic summons [sic], but we have before ex-
> pressly declined to accept the argument that
> traffic violations necessarily involve less danger to
> officers than other types of confrontations. *United
> States v Robinson,* 414 US 218, 234 [94 S Ct 467;
> 38 L Ed 2d 427 (1973)]. Indeed, it appears "that a
> significant percentage of murders of police officers
> occurs when the officers are making traffic stops."
> *Id.* at 234, n 5.
>
> The hazard of accidental injury from passing
> traffic to an officer standing on the driver's side of
> the vehicle may also be appreciable in some situa-
> tions. Rather than conversing while standing ex-
> posed to moving traffic, the officer prudently may

Constitution, may order a passenger out of a vehicle during a routine
traffic stop where the officer has no particular reason to fear the
passenger or suspect that the passenger is involved in criminal
activity. Cf. *People v Burrell,* 417 Mich 439; 339 NW2d 403 (1983) (a
passenger's refusal to identify himself or the use of an alias does not
establish probable cause to conduct a search or make an arrest).

prefer to ask the driver of the vehicle to step out of the car and off onto the shoulder of the road where the inquiry may be pursued with greater safety to both.

While *Mimms* justifies Chief Lenardson's conduct in asking Rodriguez to step from the vehicle, it does not directly answer the question whether Deputy Lenardson acted properly in asking defendant to step from the vehicle. However, we are persuaded that the reasoning behind *Mimms* is equally applicable to the passenger of a vehicle as it is to the driver of the vehicle. That is, the Supreme Court in *Mimms* concluded that an officer was justified in asking the driver to step from a vehicle for the officer's own safety, recognizing that a large number of assaults on officers occurs during routine traffic stops. This concern is equally applicable to the passenger of a vehicle as it is to a driver. In other words, if a police officer is justified in being concerned about a possible assault by the driver of a vehicle stopped during a traffic stop, that officer is also justified in being concerned about a possible assault by a passenger in that vehicle.[5]

Indeed, this reasoning persuaded the Appellate Division of the Supreme Court of New York to reach a similar conclusion in *People v McLaurin,* 120 AD2d 270, 274-275; 508 NYS2d 429 (1986):

We fail to discern any appreciable difference between driver and passenger in the degree of risk posed to the safety of a police officer. Hence, police officers are not required, as defendant contends, to

[5] Indeed, one could even advance the argument that the passenger presents a greater threat to the officer than does the driver, since the officer's attention in the traffic stop is going to be focused on the driver, and he may not be immediately aware of the activities of the passenger, including the possibility that the passenger may retrieve a firearm and assault the officer.

treat passengers differently from the driver, and we reject the argument that the circumstances which render it permissible to order a driver out of a car after a lawful stop for a traffic violation are not equally applicable to a passenger. Before a police officer orders a passenger out of a car, he is not required to have, separate and distinct from the underlying traffic violation which serves as the predicate for the stop, an articulable basis to support a suspicion either as to the existence of criminal activity by the passenger or that he poses a threat to the officer's safety.

Accordingly, we hold that a police officer may, consistent with the Fourth Amendment of the federal constitution, order a passenger to get out of a motor vehicle stopped during a routine traffic stop under the same circumstances in which the officer may order the driver to get out of the vehicle.[6] Accordingly, Deputy Lenardson was authorized to ask defendant to step from the vehicle and, therefore, was properly in a position to observe the handgun in plain view in the green leather bag in the passenger compartment of the pickup truck.[7]

However, defendant also argues that, even if the seizure of the handgun and search of the green leather bag were proper, the subsequent search of the garment bag in the bed of the pickup truck,

---

[6] Again, we make no determination of whether such a practice is permissible under the Michigan Constitution.

[7] Defendant does not dispute that the seizure of the handgun and the search of the bag containing the gun was proper if Deputy Lenardson was authorized to request defendant to step from the vehicle. Rather, defendant's argument with respect to the seizure of the handgun and the search of the green leather bag is limited to the assertion that Deputy Lenardson was not authorized to order defendant from the vehicle and, therefore, was never in a proper position to observe the handgun in plain view. Since we have concluded that the deputy was authorized, we can conclude without further discussion that the seizure of the handgun, the search of the green leather bag, and the discovery of the money were authorized.

which contained the cocaine, was improper and the trial court erred in refusing to suppress evidence of the cocaine seized. We disagree.

At the time that the officers conducted the further search of the vehicle, including Chief Lenardson's search of the garment bag, both defendant and Rodriguez were under arrest for the weapons charge and had been handcuffed and separately placed in the rear seats of the officers' respective patrol vehicles. Thus, we must determine whether the search of the garment bag without a warrant was authorized under an exception to the Fourth Amendment. We conclude that it was.

The prosecutor in his brief on appeal offers two justifications for the search of the garment bag, namely, the so-called "automobile exception" and the "search incident to arrest" exception. We conclude that the search comes within the provisions of the automobile exception to the warrant requirement.

In *United States v Ross,* 456 US 798; 102 S Ct 2157; 72 L Ed 2d 572 (1982), the Supreme Court reiterated the rule that a search of an automobile without a warrant is reasonable where the automobile legitimately has been stopped by a police officer and the police officer has probable cause to conduct the search. The Court further clarified the rule to specifically hold that if probable cause justifies the search of the lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search. Thus, the scope of a search without a warrant authorized by the automobile exception is neither broader nor narrower than that which a magistrate could legitimately authorize by a search warrant. *Id.* at 825. See also *Michigan v Thomas,* 458 US 259, 261; 102 S Ct 3079; 73 L Ed 2d 750 (1982).

Thus, the question may be framed as follows: Does the presence of a firearm and a large sum of currency in one container in a vehicle provide probable cause to believe that other weapons, contraband, or evidence of a crime may be found in another container in the vehicle? This presents a close question. Formulating an answer to this question is hampered by the fact that the prosecutor does not cite any cases in which probable cause was found to exist upon this minimal amount of evidence, nor, for that matter, does defendant cite any cases in which probable cause has been found not to exist upon this amount of evidence.[8] Thus, to resolve our question, we turn to the definition of probable cause, that the facts and circumstances would warrant a person of reasonable prudence to believe that the evidence of a crime or contraband sought is in the stated place. See *People v Goins,* 164 Mich App 559, 560; 417 NW2d 499 (1987). Thus, we need to determine whether a person of reasonable prudence would conclude from the presence of a firearm and a large sum of currency in one container that other weapons or contraband could be found in another container within the vehicle. With some hesitation, we conclude that the answer to that question is "yes."

Taken separately, neither the gun nor the currency would establish probable cause to believe that other evidence or contraband could be found

---

[8] Defendant does cite *People v Miller (On Remand),* 128 Mich App 298; 340 NW2d 858 (1983), in which the Court, in dicta, stated that probable cause did not exist to search a briefcase located inside the passenger compartment of a car, with a handgun lying in open view on the seat next to the briefcase. *Id.* at 305, n 4. However, the facts for finding probable cause are stronger in the case at bar, because both a handgun and a large sum of money were discovered and both were inside a container, rather than in plain view on the seat of the vehicle.

elsewhere in the vehicle. The presence of the gun in the container might suggest that a second gun may exist in another container, though this is far from a foregone conclusion. Similarly, the presence of such a large sum of currency without a ready explanation for its presence[9] might suggest, as it did to Deputy Lenardson, that defendants either had been involved in a robbery or were involved in drug trafficking. It therefore seems reasonable that if not another weapon, then contraband or other evidence of crime could be found in the other container in the vehicle.

We are cognizant that merely carrying a large sum of cash is not itself a crime, though carrying a concealed weapon in an automobile is a crime.[10] However, the two items, taken together, could lead a reasonably prudent person to conclude that contraband might be found in the garment bag in the bed of the pickup truck. Moreover, we will reverse a trial court's determination of a suppression issue only if the ruling was clearly erroneous, that is, if it left us with a definite and firm conviction that a mistake has been made. See *People v Harmelin,* 176 Mich App 524, 532; 440 NW2d 75 (1989). With this standard of review in mind, we conclude that the trial court did not clearly err in determining that the search was proper.

Having concluded that the search is within the automobile exception to the warrant requirement, we need not resolve the question whether the

[9] E.g., defendants were not merchants on their way to make a bank deposit.

[10] As defense counsel developed at the preliminary examination, it apparently is not a crime in defendant's home state of Texas to carry a handgun. This, however, is not entirely relevant, since the offense occurred in Michigan, not Texas. But see 18 USC 926A (a person who is lawfully entitled to possess and carry a firearm may lawfully possess and carry such firearm to any other place, provided the firearm is unloaded and is inaccessible from the passenger compartment of the vehicle).

search could be authorized as a search incident to arrest.

Affirmed.

Weaver, P.J., concurred.

Neff, J. *(dissenting)*. I respectfully dissent from the extension of the ruling of *Pennsylvania v Mimms,* 434 US 106; 98 S Ct 330; 54 L Ed 2d 331 (1977), to include a passenger in a motor vehicle which has been stopped for a routine traffic violation where there is no reason to suspect wrongdoing by or danger from the passenger.

I

In *Mimms,* the Supreme Court held that a police officer can order a driver to get out of a vehicle after a routine traffic stop, even though the officer does not have any reason to fear for his safety or to suspect criminal activity. In finding no violation of the Fourth Amendment of the United States Constitution, the Court concluded that ordering a driver to get out of a vehicle is reasonably necessary for the officer's safety from the standpoint of potential assaults on the officer, and because of potential traffic hazards resulting from standing next to the stopped vehicle while talking to the driver. The majority quotes *Mimms* and seems to adopt the same reasoning to permit an officer to require a passenger to alight from a vehicle without running afoul of the Fourth Amendment.

It should be noted that *Mimms* was decided summarily by the Supreme Court at the same time it granted certiorari. The Court granted reversal without full briefing or oral argument, in short, without plenary consideration. The two dissenting opinions both articulate the danger of issuing

important constitutional pronouncements in summary fashion. Because of the manner in which *Mimms* was decided, I believe that we should be very wary of expanding its holding beyond its narrow fact situation. In addition, I find the reasoning of *Mimms* inadequate to justify including passengers in vehicles stopped for the routine traffic violations of their drivers.

It is noteworthy that the Court in *Mimms* specifically said that it did *not* hold that an officer could order a driver to get out of a vehicle whenever the officer has occasion to speak to the driver. *Id.* at 111, n 6. While this comment is somewhat cryptic, it evidences, in my view, a recognition that the holding of *Mimms* is a very narrow one.

A

The facts of this case could not present a better example of circumstances in which to argue against yet another intrusion on Fourth Amendment protections. There is nothing in the record of this case to suggest any concern for the safety of the police officers at the time the stop was made, either by way of objective evidence or by way of subjective suspicion on the part of the officers.

The vehicle was stopped in the middle of the afternoon on the expressway for speeding and because it was emitting smoke. The chief was not using the radar in his patrol car and could not say how fast the vehicle was travelling, and he acknowledged that the vehicle slowed to approximately the speed limit as it passed him. When he stopped the vehicle, he did not observe any sudden or furtive movements by the occupants, and, while the driver did not have a driver's license, he did have other identification, including proof of insurance of the vehicle.

Chief Lenardson asked the driver to go to the patrol car and left the passenger alone in the stopped vehicle. He expressed no concern about the passenger, did not feel the need for backup assistance,[1] and essentially paid no heed to the passenger's presence in the vehicle while he dealt with the driver, who was sitting in the front seat of the patrol car at the chief's request.

When Deputy Lenardson came along, the chief asked him to find out who the passenger was. No explanation is offered for wanting or needing the identity of the passenger. Neither police officer had any reason to suspect that any danger lurked in the vehicle. When the passenger indicated that he did not have any identification with him, the deputy asked him to step out of the vehicle so he could be at eye level while they conversed further, although it is not clear just what they had to talk about at that point. It was only when the passenger got out of the vehicle that the deputy was in a position to see into the vehicle and observe the weapon which led to the arrest in this case.

On the basis of these facts, it cannot reasonably be said that there was any articulable basis for suspecting criminal activity or a threat to the safety of the officers. *People v Freeman,* 413 Mich 492; 320 NW2d 878 (1982). It certainly is of no significance that the passenger of the vehicle did not have a driver's license or other form of identification, and the passenger was under no obligation to identify himself. No adverse inference would arise from the citation of a driver for a

---

[1] Although he did inform the dispatcher that he was making a stop and where he was, he did not request help, and the record is clear that the second officer came on the scene by happenstance. Testimony at the preliminary examination was to the effect that the chief had just started to contact the dispatcher when the deputy drove up, and he specifically testified that he did not call for backup.

traffic violation. *People v Burrell,* 417 Mich 439, 454-455; 339 NW2d 403 (1983).

### B

As noted, the purported justification for the grant of authority to an officer to have a passenger get out of a vehicle during a routine traffic stop is the safety of the officer. Close analysis does not support that argument.

### 1

One of the arguments advanced is that it is not safe for a police officer to stand next to a vehicle stopped along a highway because of exposure to passing traffic. *Mimms, supra* at 111. While this line of reasoning may have some validity with regard to approaching the driver of the vehicle, it is unlikely to apply when the officer approaches the passenger side of the vehicle, which is usually shielded from moving traffic by the stopped vehicle itself, as was the situation in this case. In addition, during a routine traffic stop, there is no *need* for an officer to approach and talk with a passenger.

### 2

The other argument is that it is necessary to allow officers to require occupants to get out of vehicles to insure safety from assaults. As noted in Justice Stevens' dissent in *Mimms,* it is highly questionable whether such assaults are minimized, enhanced, or at all affected by having the occupants get out of the vehicles. *Id.* at 117-121. In fact, there are apparently some law enforcement authorities which advise an officer never to let a traffic violator get out of a vehicle during a traffic stop. See Yount, *Vehicle Stops Manual* (1976);

Folley, *Police Patrol Techniques & Tactics* (1973), cited by Justice Stevens in his dissent in *Mimms. Id.* at 119-120.

In balancing the very justifiable concern for the safety of the officer against the intrusion on individual liberty guaranteed by the Fourth Amendment, I am not convinced that the intrusion in any way furthers the goal of enhancing the safety of the officer.

Nor am I convinced that a passenger's status is the same as that of the driver stopped for a routine traffic violation. The passenger has violated no law leading to the traffic stop, and can reasonably expect that the officer will deal with the driver and send them on their way. The passenger who is merely present in a vehicle which has been stopped justifiably has a higher expectation of privacy. The officer makes a decision to stop and detain the driver for conduct quite apart from that of the passenger. Unless the officer has a legitimate reason to question or detain the passenger, that person can refuse to talk with the officer and, indeed, can walk away.

C

In sum, I believe that extending the holding of *Mimms* to include a passenger in a vehicle stopped for a routine traffic violation expands *Mimms* beyond its intended boundaries and is an unwarranted violation of the Fourth Amendment.[2]

---

[2] The majority says that this is a case of first impression. It should be noted, however, that in *People v Eichenberg,* 108 Mich App 578, 580; 310 NW2d 800 (1981), a panel of this Court did purport to extend *Mimms* to passengers of vehicles stopped for traffic violations. However, that comment in the opinion was completely gratuitous because the officer was able to see the explosive device inside the car while the passengers were still inside. To say that the officer had the right, under *Mimms,* to order the passengers to get out of the car, was

II

The majority cites *People v McLaurin,* 120 AD2d 270; 508 NYS2d 429 (1986), as a case which also extends *Mimms* to cover passengers. However, I believe that *McLaurin* is distinguishable because it does not extend *Mimms* to passengers in all routine traffic stops, as does the majority in this case. In *McLaurin,* there was an articulable suspicion of wrongdoing by the passenger. Certainly, were that the case here, I would have no objection to the action of the deputy. However, our record is utterly devoid of any evidence or testimony suggesting such a suspicion.

I am more persuaded by those cases which have refused to extend *Mimms* to situations like the one currently before us. See *State v Becker,* 458 NW2d 604 (Iowa, 1990); *Johnson v State,* 601 SW2d 326 (Tenn Crim App, 1980); *State v Williams,* 366 So 2d 1369 (La, 1978); *Commonwealth v Pollard,* 450 Pa 138; 299 A2d 233 (1973). I would reverse and remand for entry of an order suppressing the evidence.

---

unnecessary to the decision in *Eichenberg,* and the purest form of obiter dictum.